WINTER TERM, 1867. 365

Cromie's heirs vs. Louisville Orphans' Home Society, &c.

CASE 92—PETITION EQUITY—MAY 27.

# Cromie's heirs vs. Louisville Orphans' Home Society, &c.

# Cromie's heirs vs. The Institution of Mercy, New York.

# The House of Mercy, New York, vs. The Institution of Mercy, New York.

3b 365
90 674

3b 365
98 353
99 291

3bu365
107 407

3bu365
108 577
3bu365
e114 413
e114 495
3bu365
116 678
3bu365
116 678
3bu365
d119 783

APPEALS FROM LOUISVILLE CHANCERY COURT.

1. "I give, devise, and bequeath all the rest and residue of my estate, real, personal, and mixed, in as nearly equal amounts or parts as may be— say one half to *The Presbyterian Orphan Asylum of Louisville*, and the remaining one half to *The House of Mercy, of the City of New York*, to be divided equally within two years, or sold within five years, and the proceeds arising to be divided as previously set forth." *Held by the court*—That, although the corporate names are not precisely recited in the will, yet true description and extraneous facts conclusively identify the Louisville Orphans' Home Society as the object of the gift to the Presbyterian Orphan Asylum of Louisville;—the devise to the *House* of Mercy, in the City of New York, is unambiguous,—the words, interpreted in their primary sense, mean The House of Mercy, New York. Such is inevitably their construction and legal effect, without the aid of any extrinsic fact.

2. The continued operations of "The Louisville Orphans' Home Society," in Louisville, from 1849, under the constitution and charter, sufficiently implied the adoption of the one and the acceptance of the other; consequently, The Louisville Orphans' Home Society was, at the time of the death of Isaac Cromie, in 1865, a legal corporation, and as such, was a qualified recipient of his testamentary bounty.

3. Without any statutory incorporation, a gift to the society being essentially a beneficial gift to poor orphans, would be available, and not void, as it might have been by the common law unmodified by any statute of charitable uses; and such charities may be upheld and applied by the chancellor under the laws of Kentucky.

4. The words of the will, unmodified as they are by the context, must be construed according to their own primary and popular import. This, when clear, is the highest and only admissible evidence of the testator's intention. If the words thus interpreted apply with reasonable certainty to a particular object or thing, satisfactorily *identified either by description or name*, extraneous testimony is inadmissible to prove a testamentary intent essentially different. It is only when unambiguous words apply, *with equal certainty*, to different objects or things, that extraneous testimony may relieve the latent ambiguity resulting from only the same kind of evidence. When the words clearly apply to a particular person or object, no latent ambiguity can be established by proof *aliunde* of any other person or object *of a different description* or name. (*Mitchell vs. Walker*, 17 *B. Mon.*, 66; *Timberlake vs. Parrish*, 1 *Met.*, 265; *Wigram, secs.* 6, 9, 215; *Redfield, vol.* 1, *pp.* 568, 613.)

5. By the law of its creation as a corporate institution, " *The House of Mercy, New York*," is limited to, and prohibited from, holding over fifty thousand dollars in value of real estate, and seventy-five thousand dollars in personalty; therefore, as it is shown in the record that the real estate of said institution, at the time of the death of the testator, exceeding in value fifty thousand dollars, it cannot take any part of the real estate devised to it by him, and it can only take so much of the personal bequest as will, when added to the personalty held and owned by said institution at the time of testator's death, make up the seventy-five thousand dollars; and, consequently, the real estate so devised, and the remainder of the personal bequest, *relapse as undevised estate* to testator's heirs and distributees.

I. & J. CALDWELL and
W. R. THOMPSON,　　　　　　　　　　　　For Appellants,
　　　　　　　　　　CITED—
　　*Civil Code, secs.* 153, 340 ; 1 *Rev. Stat.*, 117.
　　3 *Leigh*, 450 ; *Gallego vs. Atty. Genl.*
　　4 *Dana*, 354 ; *Moore vs. Moore.*
　　23 *New York*, 298 ; *Beekman vs. Bonsor.*

2 *Redfield on Wills*, 812.

*Session Acts*, 1849, 354.

*Angell & Ames on Corpo.*, secs. 80, 83, *p.* 77.

17 *Maine*, 440 ; *Coffin vs. Collins.*

1 *Sand. Ch. R.*, 179 ; *Valk vs. Crandall.*

2 *Met.* (*Ky.*), 324 ; *Fry vs. Lex. and Big S. R. R.*

23 *N. Y. Rep.*, 356 ; *Downing vs. Marshall.*

4 *Wheaton*, 1 ; *Bap. Asso. vs. Hart.*

4 *Leigh*, 327 ; *Janey vs. Janette.*

5 *Humph.* (*Tenn.*), 197 ; *Green vs. Allen.*

14 *New York*, 380 ; *Owens vs. Missionary So.*

1 *Sim. & Stu.*, 40 ; *Wellbeloved vs. Jones.*

1 *B. Mon.*, 215 ; *Chambers vs. Bap. Ed. So.*

1 *Revised Statutes*, 235.

8 *Dana*, 38 ; *Curling vs. Curling.*

14 *Johns.*, 243 ; *Dutchess Cot. Manf. Co. vs. Davis.*

5 *Wendell*, 482 ; *Bank vs. Williams.*

9 *Cowen*, 437 ; *McCartee vs. Orph. Asy. So.*

3 *Sandf.*, 351 ; *Ayres vs. M. E. Church.*

8 *Dana*, 118 ; *Lathrop vs. Coml. Bk.*

24 *Wendell*, 630 ; *Humbert vs. Trinity Ch.*

1 *Phill.*, 290, *in* 19 *Eng. Chy. Rep.; Walsh vs. Glad-stone.*

7 *Met.* (*Mass.*) 203 ; *Tucker vs. Seaman's Aid So.*

19 *Eng. Chy. Rep.*, 270 ; *Blundell vs. Gladstone.*

*Wigram on Extrinsic Ev.*, 94, 106, 115, 137, *et seq.*

33 *Barb.*, 537 ; *Hallett vs. Harrower.*

28 *Barb.*, 59 ; *Kennedy vs. Colton.*

1 *Roper on Legacies*, 175.

22 *Conn. Rep.*, 32 ; *White vs. Fisk.*

15 *Wendell*, 314 ; *U. S. Bank vs. Stearns.*

THOS. W. GIBSON,                           On same side,
CITED—

32 *Miss.*, 218 ; *Bank of Commerce vs. Mudd.*

2 *Marshall*, 102 ; *U. S. Bank vs. Norrell.*

2 *Brownl. and G.*, 100 ; 16 *Ind.*, 40.

3 *Ind.*, 284 ; *Morgan vs. Lawrenceburg.*

2 *Metcalfe*, 314 ; 28 *Barb.*, 59 ; *Kennedy vs. Colton.*

33 *Barb.*, 537 ; *Hallett vs. Harrower.*

23 *Vermont*, 336 ; *Button vs. American Tract Society.*

1 *Redfield on Wills*, 572 *to* 691.

*Revised Stat.*, chap. 21, sec. 25, 1 *Stant.*, 264.

*Act incorporating Louisville Orphans' Home Society,*
　　*Feby.* 26, 1849.

BULLOCK & ANDERSON and
BODLEY & SIMRALL,　　　For House of Mercy, New York,
　　　　　　　　　　　CITED—

*Wigram's Extrinsic Ev.*, secs. 6, 9, 18, 29, 104, 211,
　　213, 215, 35, *note* 39n, 121, 126 *to* 130, 215, 203, 186.

1 *Redfield on Wills*, pp. 594, 574, 565, 568.

1 *Jarman on Wills*, p. 329, chap. 12, sec. 8.

2 *DeG. M. & S.*, 708 ; *Harwood vs. Griffith.*

1 *Vesey, jr.*, 412 ; *Delman vs. Robells.*

1 *Cox*, 425 ; *Andrews vs. Dodson.*

12 *Ves.*, 219 ; *Holmes vs. Constance.*

1 *Y. & C. C. C.*, 654 ; *Wilson vs. Squire ;* 20 *Eng.*
　　*Chy.*, 654.

1 *Brown's Ch. Ca.*, 84 ; *Waybank vs. Brooks.*

7 *Metc.*, 209 *and* 416 ; *Tucker vs. Seaman's Aid So.*

1 *Greenleaf's Ev.*, sec. 63.

*Angell & Ames on Corps.*, secs. 99, 102.

*Wilcox on Corps.*, secs. 50, 36, 37, 39.

10 *Coke's Rep.*, 267 ; *Dalison*, 78 ; 2 *Marsh*, 174.

6 *Taunt.*, 467 ; 13 *Mass.*, 141 ; 2 *Met. (Ky.)*, 78.

2 *Kay & John.*, 740 ; *Bennett vs. Marshall.*

1 *Sm. & Gif.*, 126.

1 *Phillips* (19 *Eng. Chy.*), 270, 285, 286, 289.

17 *Eng. Chy.*, 103, 104 ; 19 *Ib.*, 501.

3 *Watts (Pa.)*, 385 ; *Vernor vs. Henry.*

4 *Barb.* (*N. Y.*), 81 ; *Banks vs. Phelan.*

15 *Connecticut*, 292, 274 ; 23 *Vermont*, 346, 348, 349.

2 *Marshall*, 50 ; *Breckinridge vs. Duncan.*

3 *Mar.*, 123 ; *Humble vs. Humble.*

5 *J. J. M.*, 351 ; *Noland vs. Johnson.*

3 *Littell*, 302 ; *Kenney vs. Kenney.*

7 *Mon.*, 428 ; *Webb vs. Webb.*

2 *Dana*, 47 ; *Tudor vs. Terrell.*

5 *Dana*, 345 ; *Timberlake vs. Parrish.*

1 *B. Mon.*, 111 ; *Haydon vs. Ewing.*

6 *B. M.*, 219 ; *Long vs. Duvall.*

8 *B. M.*, 600 ; *Stephen vs. Walker.*

3 *B. M.*, 291 ; *Wheeler vs. Dunlap.*

17 *B. M.*, 61 ; *Mitchell vs. Walker.*

1 *Met.*, 265 ; *Allen vs. Vanmeter.*

10 *Co.*, 306 ; 15 *Vin. Ab.*, 491.

3 *Randolph's Rep.*, 141–4 ; *Sandford's Chy. Rep.*, 758.

24 *Wendell*, 629, 630 ; *Humbert vs. Trinity Church.*

7 *Sergt. & Rawle*, 320–23 ; 7 *Barr*, 233.


HAMILTON POPE,

E. S. WORTHINGTON, and

BULLOCK & ANDERSON,   For Lou. Orphans' Home Society,
CITED—

1 *Jar. on Wills*, pp. 363–4, 359–60.

1 *Greenleaf on Ev.*, sec. 289.

2 *Marshall*, 50 ; *Breckinridge and wife vs. Duncan.* 

7 *Met.* (*Mass.*), 416 ; *Minot vs. Boston Asylum.*

1 *B. Mon.*, 220 ; *Chambers vs. Baptist Ed. Society.*

4 *Dana*, 354 ; *Moore vs. Moore.*

8 *Dana*, 38 ; *Curling vs. Curling.*

7 *B. M.*, 11 ; *Attorney Genl. vs. Wallace.*

*Revised Statutes*, chap. 14, secs. 1, 2.

2 *Dana*, 177 ; *Gass & Bonta vs. White, &c.*

2 *Kent*, 292 ; 4 *Shep.*, 224 ; 11 *N. H.*, 102.

·2 *Fairf.*, 227 ; 12 *Wheat.*, 71.

*Angell & Ames on Corp.*, sec. 83 ; 1 *Hall*, 191.

MARTIN BIJUR,
JAMES S. PIRTLE, and
LEWIS N. DEMBITZ,                    For Institution of Mercy,
CITED—

*Civil Code, sections* 117, 896.

17 *B. Mon.*, 13 ; *Sanders vs. Sanders.*

2 *Met.*, 210 ; *Schwein vs. Sims.*

7 *Sergt. & Rawle*, 320–23 ; *Leazure vs. Hillyas.*

4 *Sandford's Chy. Rep.*, 758 ; *Borgardus vs. Trinity Church.*

24 *Wend.*, 587, 604, 629 ; *Humbert vs. Trinity Church.*

6 *Cowen*, 23 ; *Vernon Society vs. Hills.*

16 *Peters*, 492–3 ; *Harpending vs. The Dutch Church.*

11 *Sergeant & Rawle*, 418 ; *Baird vs. Bank of Washington.*

3 *Randolph's R.*, 136 ; *The Bank vs. Poitiaux.*

2 *Met.*, 277 ; *Allen vs. Vanmeter.*

*Redfield on Wills, pp.* 576, 627.

*Greenleaf on Ev.*, sec. 290.

5 *Meeson & Welsby*, 367 ; *Hiscox vs. Hiscox.*

12 *Ad. & El.*, 92 ; *Allen vs. Allen.*

5 *Rep.*, 68 ; *Cheny's Case.*

·2 *M. & W.*, 129 ; *Gord vs. Needs.*

19 *Eng. Chy.*, 270 ; *Blundell vs. Gladstone.*

6 *Mad.*, 192 ; *Still vs. Hoste.*

2 *Kay & Joh.*, 740 ; *Bennett vs. Marshall.*

20 *Eng. Chy.; Wilson vs. Squire.*

15 *Conn.*, 274 ; *Brewster vs. McCall's devisees.*

16 *Conn.*, 302 ; *Ayres vs. Weed.*

23 *Vermont*, 336 ; *Button's ex'rs vs. Am. Tract Society.*

4 *Bradf. Sur. Rep.*, 162 ; *Hart vs. Marks.*

5 *Mar.*, 506 ; *Breckinridge vs. Duncan.*

1 *B. Mon.*, 111 ; *Haydon vs. Ewing's devisees.*

8 *Dana*, 38 ; *Curling's adm'r vs. Curling's heirs.*

2 *Vesey, sr.*, 216 ; *Hampshire vs. Pierce.*

2 *Meeson & Welsby*, 129 ; *Doe and d, Gord vs. Needs.*

4 *Vesey, jr.*, 630 ; *Price vs. Page.*

8 *Bingh.*, 244 ; *Miller vs. Travers ; Wigram*, 160, *note.*

16 *L. J. N. S. Chy.*, 434 ; *Reynolds vs. Wheelan.*

1 *Met.*, 264 ; *Allen and wife vs. Vanmeter's devisees.*

13 *B. Mon.*, 292 ; *Wheeler's ex'rs vs. Dunlap.*

17 *B. Mon.*, 66 ; *Mitchell vs. Walker.*

3 *Barn. & Ald.*, 632 ; *Chevalier vs. Huthwaite.*

3 *Meeson & Welsby*, 263 ; *Hiscox vs. Hiscox.*

6 *Mann. & Gr.*, 359 ; *Winter vs. Perratt.*

JUDGE ROBERTSON DELIVERED THE OPINION OF THE COURT:

This case involves the legal interpretation and effect of the will of Isaac Cromie, of the city of Louisville, Kentucky, published October .the 12th, 1864, and disposing of an estate apparently large, but of unascertained value. Dying in August, 1865, wifeless and childless, his collateral heirs brought this suit in equity for the larger portion of his estate, which his will dedicated to two charitable institutions, by the following clause, succeeding a few personal legacies : "*Sixth.* I give, devise, and bequeath all the rest and residue of my estate, real, personal, and mixed, in as nearly equal amounts or parts as may be— say one half to *The Presbyterian Orphan Asylum; of Louisville*, and the remaining one half to *The House of Mercy, of the City of New York*, to be divided equally within two years, or sold within five years, and the proceeds accruing to be divided as previously set forth."

The petition alleges that there are no such legal corporations qualified to take the estate so abortively

devised; and, consequently, the petitioners claim that residual interest, as heirs and distributees of a deceased intestate, to that extent.

The executors resist the claim of the petitioners, and aver that, at the date of the will, there was, and still is, in Louisville, a charitable corporation patronized by the Presbyterian Churches of that city, which, though styled in its charter "The Louisville Orphans' Home Society," was yet clearly contemplated by the testator as one of the recipients of his munificence; and also, that there are, and were at the time of publication, two corporations in the city of New York, each of which claims to be the other beneficiary intended in the will, one chartered as "*The House of Mercy, New York,*" and the other as "*The Institution of Mercy;*" and all these three corporations, being made defendants by the executors, interpleaded and asserted their respective claims as beneficiaries under the will.

The chancellor divided the residuary fund between "The Louisville Orphans' Home Society" and "*The Institution of Mercy;*" and from that decree the testator's heirs and "The House of Mercy, New York," have appealed.

The heirs complain that the chancellor erred in decreeing in favor of "The Louisville Orphans' Home Society," because, as argued, no such corporation existed, and, according to the common law, a testamentary gift to an unincorporated society is void; and "The House of Mercy, New York," insists that itself, and not "The Institution of Mercy," was intended by the testator.

These two radical questions thus raised will be cronologically considered, and the many subsidiary questions, elaborately argued by the learned counsel for all the parties, will be comprehensively answered, without spe-

# WINTER TERM, 1867. 373

Cromie's heirs vs. Louisville Orphans' Home Society, &c.

cial notice of most of the subordinate points or specific arguments.

1. It satisfactorily appears, that early in February, 1849, an assemblage of persons, representing the then five Presbyterian Churches in the city of Louisville, resolved to organize a society for the support and curation of destitute and helpless orphans, adopted an organic law, appointed managers, and drafted a charter of incorporation, which was, on the 26th of February, 1849, adopted by legislative enactment. It also appears, from testimony unexcepted to, that the society thus organized and incorporated has continued its charitable mission under its constitution and charter ever since their adoption.

It is not, however, expressly shown that the constituent members, consisting of not only the persons present at the initial meeting, but also of "the pastors, elders, deacons, and trustees, for the time being, of the Presbyterian congregations within the city of Louisville," ever formally signed the constitution, as may have been contemplated by it, nor that there was ever any express acceptance of the charter; but the continued operations under the constitution and charter sufficiently implied a binding adoption of the one and acceptance of the other. Consequently, "The Louisville Orphans' Home Society" was, at the time of Cromie's death, a legal corporation, and, as such, was a qualified recipient of his testamentary bounty.

But, without any statutory incorporation, a gift to the society, being essentially a beneficial gift to poor orphans, would be available, and not at all, as earnestly argued, void as it might have been by the common law, unmodified by any statute of charitable uses.

While the statute of *Elizabeth* concerning charities was constructively abolished in Kentucky (*1st vol. Rev. Stat.*,

*p.* 77), it was, in American phase, substantially re-enact-
ed. (*Ib.*, *p.* 235.) And thus, though the ultra-judicial
*cy pres* doctrines which royal prerogative attached as
excrescences to the statute of Elizabeth, had, by its re-
peal, been cut off as tumors, the aim of our own statute
for upholding charities is to make *such as it enumerates
available whenever so defined as to be judicially identified and
applied.* And, among the charities provided for by our
statute, we find gifts for the benefit of orphans, which,
even though unavailable at common law, for want of
any lodgment of the legal title in any certain person,
are legalized and made available by the second section
of the act which provides, that "*no charity shall be defeated
for want of a trustee or other person in whom the title may
vest; but courts of equity may uphold the same by ap-
pointing trustees, if there be none, or by taking control
of the fund or property and directing its management,
and settling who is the beneficiary thereof.*"

Under the British statute, the *cy pres* doctrine became
so arbitrary and latitudinary as to prevent the evident ob-
ject of donors to charities which they never contemplated
and to which they would never have contributed. That
judicial legislation, or rather royal usurpation of the pre-
rogative of changing or making wills, was repudiated
by this court while the statute of Elizabeth was itself
recognized as the law of this State. It has also been
renounced in some other States, and especially by New
York. In *Beekman vs. Bonson, 23d New York Rep., p.*
298, the court said:

" That *cy pres* power which constitutes the *peculiar* fea-
ture of the English system, and is exerted in determining
gifts to charity when the donor has failed to define them,
and in framing schemes of approximation near to or
remote from the donor's true design, is unsuited to our

institutions, and has no existence in the jurisprudence of the State on this subject." This means, that in New York, the application of charities is strictly *judicial*.

And in *Moore vs. Moore, 4th Dana*, 366, this court said: "We are satisfied that the *cy pres* doctrine is not and should not be a judicial doctrine, except in one kind of case—where there is an available charity to an identified or ascertainable object, and a particular mode, inadequate, illegal, or inappropriate, or which happens to fail, has been prescribed."

But, with the restrictive interpretation thus indicated, charities in Kentucky, as well as in England and elsewhere, have long been, and yet are, peculiar favorites of modern jurisprudence. And, before the repeal of the statute of Elizabeth, this court said: "Public charities are public blessings, and the Commonwealth is interested in giving force and effect to them. They redound to the interest of the Commonwealth, and good policy requires that the beneficent object of the founder should be carried out and enforced."

Hence, we presume that the only object of the repeal of the British statute, in some respects more local and consistent with British policy, was to substitute a system more congenial with our institutions, and, by a legislative indorsement of the doctrine suggested in *Moore vs. Moore, supra,* to eliminate the *cy pres* doctrine of England. Consequently, *American* charity, properly defined, and judicially upheld and applied, is still a favored nursling of Kentucky.

The fair conclusion must therefore be, that a testamentary gift to orphans, patronized by the Presbyterian Churches of Louisville, would be good and available as a statutory charity; and, consequently, if the Louisville Orphans' Home Society be not a legal corporation,

capable of taking as an artificial person, the charity contemplated may be upheld and applied by the chancellor.

But that society *is* a legal being, capable of taking, as such, the title bequeathed, if it be the corporation intended by the testator, although the corporate name is not precisely recited in the will, yet true description and extraneous facts conclusively identify the "Louisville Orphans' Home Society" as the object of the gift to "The Presbyterian Orphan Asylum of Louisville." It was the Presbyterian and only Presbyterian corporation of the like kind, and no other corresponded with its corporate name. It was generally called, and often even by the corporators and managers, "The Presbyterian Orphans' Asylum," as styled by the testator; and he patronized it by annual subscriptions to its charitable objects. Without useless elaboration, we conclude with judicial certainty that the testator described and intended to give to the appellee, "The Louisville Orphans' Home Society."

Wherefore, the decree in its favor is affirmed.

2. The foreign contestants both claim to be legal corporations under the authority of a New York statute of 1848, authorizing, in a prescribed mode, the voluntary "incorporation of benevolent, charitable, scientific, and missionary societies." The chartered mission of "The House of Mercy, New York," is the reclamation of fallen women; that of "The Institution of Mercy," such protection to upright and helpless females as may preserve their chastity. Each of them exhibits evidence of conformity to the general law, and shows that, long before Cromie's death, and ever since, they have been acting as corporations with the knowledge and acquiescence of their State; and the "*House* of Mercy" shows

also two legislative donations to it as a corporation—one as "The House of Mercy, New York"—the other as "Mrs. Richmond's House of Mercy," which it was frequently called, as Mrs. Richmond was its foundress and superintendent.

The legality of these acting corporations has not been denied in the pleading, or litigated in this case, but seems to have been admitted by general recognition of all parties; and, therefore, from these considerations, the legal presumption results, that, although, in some formalties prescribed by the general law, there may not be the best proof of a punctilious conformity, yet all that was required has been substantially done; and therefore, an objection now to the legal existence of either of these corporations, should be unavailing.

Then, the decisive question arises, is either of these corporations, and, if either, which is the object of the testator's bounty?

"New York," as added to "The House of Mercy," and as separated from it by a comma, should be understood, not as an essential portion of the corporate name, but only as descriptive of the locality of the corporation, and should be deemed simply equivalent to "*in* New York;" and, as no State could charter an extra-territorial corporation, and, therefore, the simple name of "House of Mercy" would have, constructively, localized the corporation within the State of New York, the addendum, "New York," could have been intended only for localization in the city of New York. Consequently, "New York," or "*in* New York," should be held synonymous with "in the city of New York;" and, with this interpretation, the devise to "The House of Mercy in the city of New York," essentially corresponds with, and sufficiently identifies, "The House of Mercy, New York."

According to this conclusion, there is no latent ambiguity as to the object intended by the testator; for his words, in their primary sense, are equivalent to "The House of Mercy, New York," and clearly describe the unsuccessful claimant; and a person or thing may be as well identified by description as by name. A characteristic and contradistinctive definition or description may often identify the object even better than the arbitrary and isolated name of it; and the simple name is always more certainly identified when illustrated by an accompanying description. Then, independently of extraneous aid, the appellant corporation is undoubtedly that which the testator intended, unless there be sufficient proof of the corporate existence of some other "House of Mercy in the city of New York." Such proof alone would create a latent ambiguity and authorize extrinsic evidence for certifying which "House of Mercy" was contemplated by the testator.

"The *Institution* of Mercy" assumes this antagonism, and, insisting that a latent ambiguity thus results, much oral testimony has been taken to show which of these conflicting corporations was intended by the will.

"The *Institution* of Mercy," and "The *House* of Mercy, New York," are essentially different titles. These names alone do not produce a latent ambiguity. To approximate such ambiguity, extraneous proof of identity in location was necessary. "The *House* of Mercy" is localized in the city of New York by *its* title. The simple title of "The Institution of Mercy" does not, necessarily, import that identical locality. On the face of the titles, one corporation must be in the city, and the other may be anywhere else in the State of New York. Moreover, the law of New York prohibits any corporation from assuming the name of another. Con-

sequently, the names of these corporations create no latent ambiguity; and can this be done by extrinsic testimony?

The words of the will, unaffected, as they are, by the context, must be construed according to their own primary and popular import. This, when clear, is the highest and only admissible evidence of the testator's intention. Any other rule might frustrate the aim and defeat the conservative end of the statute requiring all testamentary dispositions to be written and proved in a form peculiarly stringent and solemn.

If the words, thus interpreted, apply, with reasonable certainty, to a particular object or thing, satisfactorily identified either by description or name, extraneous testimony is inadmissible to prove a testamentary intent essentially different. It is only when unambiguous words apply, *with equal certainty*, to different objects or things, that extraneous testimony may relieve the latent ambiguity resulting from only the same kind of evidence.

When the words clearly apply to a particular person or object, no latent ambiguity can be established, by proof *aliunde*, of any other person or object, *of a different description or name*.

These consistent doctrines are recognized by Wigram and Redfield on abundant authorities conclusively fortified by *Mitchell vs. Walker*, 17 *B. Mon.*, 66; *Timberlake vs. Parrish*, 5th *Dana*, 345; *Allen vs. Vanmeter*, 1st *Met.*, 265, and other cases adjudged by this court.

Wigram also secretes from the cases cited by him the following supplemental rules: "The judgment of a court in expounding a will should be simply declaratory of what is in the instrument." (*Wig., sec.* 6.)

"The question is not what the testator meant as distinguished from what his words express, *but simply what*

*is the meaning of his words;* and extrinsic evidence in aid of the exposition of his will must be admissible or inadmissible with *reference to its bearing upon the issue which this question raises.*"   ( *Wig., sec.* 9.)

" The only cases in which evidence to prove intention is admissible are those in which the description in the will is *unambiguous* in its. application to *each* of several objects."   ( *Wig., sec.* 215.)

And in *Redfield on Wills, volume 1st, page* 568, *section* 13, the author, on the authority of many cases, says : " Parol evidence of intention, from the declarations of the testator or otherwise, does not seem to have been regarded as admissible to show, that when the description in the will imperfectly applies to one person and more perfectly to another, the former was really intended.   This is not the case of what *Lord Bacon* regarded as a strict *equivocation,* there not occurring precisely equal ground of application of the terms to two objects; the case *must* be determined upon the preponderance in favor of one *as matter of construction;* and there is no occasion to resort to extrinsic evidence."   And such also was the judgment of this court in the case of *Mitchell vs. Walker, supra.*

Tested by these principles, too well established to be now judicially doubted or disregarded, the question we propounded will be truly answered.

The devise to " The *House* of Mercy, in the city of New York," is unambiguous.   The words, interpreted in their primary sense, mean " The House of Mercy, New York." Such is, inevitably, their constructive and legal effect, without the aid of any extrinsic fact.   Unless, therefore, " The *Institution* of Mercy " means the same thing, there is no occasion for extrinsic evidence.   But we have said, that, construed according to their solitary and primary

import, these words are not, in either letter or effect, synonymous with "The *House* of Mercy, *New York*." And, if they may approach identity, the approximation is more doubtful and remote than the words of the will— "The *House* of Mercy, in the city of New York."

Had there been no other corporation in the city of New York dedicated to mercy, the testator would necessarily have been presumed to intend "The Institution of Mercy;" but as there is another corporation in that city far more exactly defined in the will, oral testimony is inadmissible to prove that the testator intended his gift for the "Institution of Mercy." But a careful analysis of all the oral testimony exhibited in the record tends to the same conclusion—that the testator meant "The House of Mercy, New York."

"The House of Mercy" is Protestant, "The *Institution* of Mercy" Catholic. The testator was a Protestant, patronized a Protestant Church; and, though his deceased wife was a Catholic, and some of his friends Catholics, and one of them his legatee to the amount of seven thousand five hundred dollars, yet he was strongly prejudiced against Catholicism. And, while he expressed gratitude to Catholic Sisters of Mercy for their signal benevolence, and especially during the late rebellion, he said that they were controlled in their beneficence by their priests. Having expressed surprise that there was no Protestant organization for the reclamation of fallen women, he was told that there was one in the city of New York. This proves that he felt an interest in just such a corporation as that of "The House of Mercy, in the city of New York," and was apprised of its existence, and approved its mission; and there is no direct proof that he had ever heard of "The Institution of Mercy," or preferred its mission.

He may be presumed to have known that there were many Catholic Sisterhoods of Mercy devoted to the protection of unfallen females; and hence, he may have inferred that there was some such institution in the City of New York; but this is not otherwise proved.

He was also a devoted *Free Mason*, and often spoke of the antagonism of Masonry and Catholicism.

He was well acquainted with a Catholic House of Mercy near his own residence, in Louisville, whose mission, like that of "The House of Mercy, New York," was to relieve fallen women; and, therefore, it would seem strange that, if he intended to aid a Catholic institution, he did not make that so near him the recipient of his bounty, and thereby keep the money in his own city, instead of sending it to New York to subserve an unknown foreign institution, under the control of the Catholic priesthood. Hence it appears that he *not only preferred a reforming institution, but was unwilling to patronize one that was Catholic*.

One witness however, a Catholic married woman, in Louisville, to whom the testator bequeathed the legacy of seven thousand five hundred dollars, and who carried on an epistolary correspondence with him in the same city, testified that, shortly before his death, he told her that "there was an order in New York called the Sisters of Mercy, which he liked very well; and he then stated that he intended to do something for those sisters in New York." This testimony, if accredited, proves but little. The testator did not say that the sisters he alluded to were Catholics. He might have meant the Protestant Sisters of Mercy, who superintended "The House of Mercy, New York." He certainly did not expressly refer to "The Institution of Mercy," or suggest that he had ever heard of it or of its objects. The counter-

vailing tendency of this scrap of evidence is, consequently, quite slight, and especially as the conversation occurred after the publication of the will.

The proof also shows, that, though "The House of Mercy" was sometimes called "Mrs. Richmond's House of Mercy," because managed by her, yet it was extensively called "The House of Mercy," without that descriptive prefix, and was so styled in printed documents from time to time sent to Louisville, and there distributed and read; and it shows, also, that "The Institution of Mercy" was seldom so called, but was called by various other names, and its buildings labeled by a different name.

According to this essentially true outline of the extraneous facts, the most rational deduction is, that the New York beneficiary, intended by the testator, was "The House of Mercy, New York."

But the counsel for the appellant heirs insist, that though the testator intended to give, yet neither of the New York claimants had a legal right to take, because the law authorizing their charters limited their right to hold corporate property to fifty thousand dollars realty and seventy-five thousand dollars personalty, the annual income of the aggregate not to exceed ten thousand dollars; and because neither the amount claimed under Cromie's will, nor the value of the corporate property owned by either of the New York claimants appearing on the record, neither has shown that it did not, at Cromie's death, own property to the maximum amount allowed by the law of New York.

This argument, though plausible, is not sound and available for the purpose of making the devise void. An alien may take, but cannot hold, against the sovereign's will, real estate; yet he may rightfully hold until

the sovereign shall choose to claim the property as forfeited to public use. So land, forfeited under 'the mortmain acts in England for being conveyed to a corporation without license, may, nevertheless, when so alienated, be held until the heir or crown enters for the forfeiture.

The question of title is between the corporation and the owner of the forfeited right, and no stranger can take advantage of the defeasibility of the title. This doctrine is conclusively settled by British authorities, and is confirmed in this country by many American adjudications. (*See especially the great cases of Leasure vs. Hilleyas, 7th Sergeant & Rawle, 320; Bogardus vs. Trinity Church, 4th Sandford's Ch. Rep. (New York), p. 758; and Harpending vs. The Dutch Church, 16th Peters' U. S. Rep., p. 492.*)

The limitation in this case is a mere matter of State policy, and the State of New York alone can take advantage of its violation.

But, notwithstanding this legal conclusion, should a court of equity enforce the devise against the heirs when, if the limitation has been transcended, the State of New York may take from the devisee the excess over the maximum of the prescribed value, and this court might thus give it, whatever it may be, to an object never contemplated by the testator, and to which he never would have devised it? The answer is, clearly not, if there be any such excess. The question of the existence and extent of such excess depends on the value of the devise and that of the corporation's property dedicated to charity at the time of the testator's death; and, on that question, there is, in this case, neither proof nor allegation, except as to the value of the real estate of "The House of Mercy," shown in the record to have exceeded fifty thousand dollars at the time of Cromie's death. None of the real

estate devised to that corporation should, therefore, be adjudged to it in this case, but relapses to the testator's heirs and should be decreed to them.

As the record furnishes no means for fixing the value either of the half of the testator's personalty as bequeathed to "The House of Mercy," or of its own personal estate, at his death, this court cannot presume that the accession of the former to the latter fund would not make an aggregate exceeding seventy-five thousand dollars, nor can we, consistently with safety or justice, hazard the enforcement of the personal legacy to "The House of Mercy" without proof on this vital question. We cannot prudently take the whole bequest from Cromie's distributees and give it to a foreign corporation without any proof of its equitable title to the whole or any ascertained amount of it.

On the return of the cause, the chancellor is, therefore, directed to ascertain the value of the testator's personalty, bequeathed to "The House of Mercy," at the time of his death, and the value also of that corporation's personal property at the same time; and whatever the two values may exceed seventy-five thousand dollars, he should decree to Cromie's appellant distributees; and if the personalty owned by that institution, at Cromie's death, was less than seventy-five thousand dollars, the chancellor will decree to it as much as will make the *maximum* of seventy-five thousand dollars; and the balance, if any, to the appellant distributees.

Wherefore, the judgment in favor of "The Institution of Mercy" is reversed, and the cause, as to this branch of it, remanded for proceedings and ulterior decree or decrees conformable with the foregoing principles.

Cromie's heirs vs. Louisville Orphans' Home Society, &c.

JUDGE WILLIAMS DELIVERED THE FOLLOWING SEPARATE OPINION:

Isaac Cromie, a citizen of Louisville, Kentucky, died testate in August, 1865, having published his will October 12, 1864. He left no surviving wife, issue, or parents. After several specific devises and bequests, he devised and bequeathed one half of his residual real and personal estate to the "*Presbyterian Orphans' Asylum, of Louisville*," and the other half to "*The House of Mercy, of the city of New York.*"

Appellants, John P. Cromie, Susan Saul, Isaac C. Saul, William Saul, Thomas Dell, and Martha Dell, his wife, as the collateral kindred, heirs-at-law, and distributees of decedent, instituted suit against the executors, denying that there were any such persons or corporations designated in the residual clause of the will, and pray the court to adjudge this large real and personal estate to them.

The executors make their answer a cross-petition against "The Louisville Orphans' Home Society," "The House of Mercy, New York," and "The Institution of Mercy."

"The Louisville Orphans' Home Socity," claiming to be incorporated by the laws of Kentucky, and to be conducted by the Presbyterian Churches of Louisville, under their patronage, and sustained by them, claim to be one of these residuary devisees.

"The House of Mercy, New York," incorporated under a general statute of the State of New York, and under the patronage of the Protestant Episcopalian Church, and "The Institution of Mercy," incorporated under the same statute, a Roman Catholic institution, both claim to be the other devisee.

There were no cross-pleadings between the plaintiffs and either of these corporations, but as to them, the cross-petition of the executors and their answers thereto constitute the whole. The chancellor decreed one half of the residual estate to "The Louisville Orphans' Home Society," and the other half to the Catholic "Institution of Mercy," from which the heirs-at-law have appealed as to both, and from which the Episcopalian "House of Mercy" has appealed as to the Catholic "Institution of Mercy."

It is manifested that there is, and at Cromie's death and date of his will was, but the one institution in Louisville under the patronage of the Presbyterians or their Churches of the character of this, or one in anywise resembling an orphans' asylum, the object of which was to furnish destitute orphans a home, and that this was as commonly known as "The Presbyterian Orphans' Asylum" as by its true corporate name.

It is insisted by the heirs-at-law that there is no sufficient evidence that the charter, approved February 26, 1849, enacted by the Kentucky Legislature, has ever been accepted by the society.

It is in proof that, on the night of February 3, 1849, representatives from the various Presbyterian Churches in Louisville met in an adjourned meeting, called for the purpose of organizing such a society, and then adopted a "constitution," after reading, discussing, and fully considering each article thereof. Its first article provides, that "*this association shall be called the Louisville Orphans' Home Society.*"

After its adoption, its officers were duly elected according to its provisions, after which, "on motion, *the draft of a charter for the society, to be obtained from the Legislature of Kentucky, was read and approved, and the officers of the*

*society were requested to transmit the same to our Representatives in the Senate and House of Assembly,* for them to lay before the Legislature, and, if possible, obtain its passage through that body." All this appears from the proven records of the association.

Twenty-three days thereafter, the Legislature did grant a charter, reciting in the preamble, that " whereas, *a society has been formed in the city of Louisville,* for the benevolent and laudable purpose of protecting, relieving, supporting, and instructing orphans and destitute children; and whereas, *the said society believe that their* sphere of usefulness will be enlarged and their charitable designs greatly promoted by a grant of corporate powers; therefore,

" SEC. 1. *Be it enacted by the Commonwealth of Kentucky,* That *all such persons as now are,* or shall hereafter become, members of said society shall, when so associated, become, and are *hereby declared* to be, a body-politic, under the name and style of '*The Louisville Orphans' Home Society,*' and by that name shall have perpetual succession." Not only reciting that such a *society existed,* but that it wanted a charter; and then granting the petition, and its own associate, as *the corporate name,* and designating it with the quotation marks, leave no doubt but the charter enacted by the Legislature was the very one proposed to, considered by, and adopted at, the adjourned meeting of February 3, 1849, of said association. Besides, it is proven by several witnesses that said Orphans' Home Society has been doing its business under a charter from the Legislature as well as its constitution so adopted.

After this institution has existed and dispensed its alms for near twenty years, and become thoroughly identified with a great city, it is too late, in any questionable or

collateral way, to deny its corporate existence. This can only be done by the interposition of the sovereign that granted it.

The parol evidence abundantly establishes that the testator knew of, and was a regular contributor to, this institution; that he approved of its objects, and felt interested for its welfare, being himself of Presbyterian faith, though not a communicant.

It also appears, that about the time of making his will, he inquired of one of its officers, and who he probably knew was an officer in the corporation, how it was designated from other institutions of the same character in the city, and was told by the word *"Presbyterian,"* without any further statement as to its corporate name.

It is again said that the charter does not authorize it to take by bequest. Its language is, "and the said corporation shall be capable in law of receiving, taking, and holding, by gift, grant, purchase, and devise, real and personal estate." And if, even at its date, the word "devise" should be regarded as technically referring to real estate, and that neither "gift" nor "purchase" should authorize it to take a bequest, yet, by *section 25, chapter 21, 1 Stanton's Revised Statutes,* 264, our Legislature has enacted that the words "legatee" and "devisee" shall be held to convey the same idea, and that "bequeath" and "devise" shall be held to mean the same thing, and to embrace and include either "real or personal estate or both." So that, whatever may have been the legal meaning of the word devise at the date of this charter, by a subsequent enactment, previous to the date of this will, this legal meaning has been changed, and that when this will was made, the power to take by devise included the power also to take by bequest. But it is also insisted that this corporation is not named in the will.

In *Angell & Ames on Corporations*, section 99, page 87, it is said : " In all grants by or to a corporation, though expressed to show that there is such an artificial being, and to distinguish it from all others, the body is well named, though there is a variation in words and syllables. The name of a corporation frequently consists of several words, and an omission or alteration of some of them is not material. The Supreme Court of New Hampshire say that there is this difference between the alteration of a letter or the transposition of a word, between naming a natural person and naming a corporate body. It makes entirely another name of the person in the one case, while the name of a corporation frequently consists of several *descriptive* words, and the transposition of them, or an interpolation *or omission of some of them, may make no essential difference in their sense.* The rule has been stated to be, that in grants and conveyances the name must be the same *in substance* as the true one, but need not be the same in words and syllables. *In a devise to a corporation, if the words (though the name be entirely mistaken) show that the testator could only mean a particular corporation, it is sufficient;* as, for instance, a devise to *John* Bishop, of Norwich, when his name is *George.* So it was held in Massachusetts, that a devise to the inhabitants of the *south* parish may be enjoyed by the inhabitants of the *first* parish." And in section 185, the same authors say : " In instruments granting, *devising*, or *bequeathing* lands and other property to corporations, and in grants by them, a misnomer of a corporation does not vitiate; provided the identity of the corporation with that intended by the parties to the instrument is apparent."

The devise is to the " Presbyterian Orphans' *Asylum*, of Louisville," instead of the " Louisville Orphans' Home

Society." "Asylum," signifies a refuge; sanctuary; a charitable institution. Home signifies a dwelling.

It is apparent, then, from the will, that the testator intended the bounty for that charitable institution, sanctuary, or refuge, controlled by the Presbyterians, designed for the orphans of Louisville. And the Louisville Orphans' Home Society is so conducted by this particular body of Christians, in Louisville, and as an asylum for orphans, and none other is so conducted by them. The very object of the testator in donating this large legacy as a charity will be carried out in the manner, and under the control of the Church, he desired, by the Louisville Orphans' Home Society; and we could scarcely doubt that it was this institution the testator had in his mind, without the aid of the extraneous evidence, but with it, no rational doubt remains; and the chancellor properly decreed in its favor.

The residuary clause of the will is in the following language:

"I give, devise, and bequeath all the rest and residue of my estate, real, personal, and mixed, of which I shall be seized and possessed, or which I shall be entitled to at the time of my decease, in as nearly equal amounts or parts as may be, say one half to the Presbyterian Orphans' Asylum, of Louisville, and the remaining one half to The House of Mercy, of the city of New York, to be divided within two years, or sold within five years, and the proceeds accruing to be divided as previously set forth."

This is a devise, in direct terms, to The House of Mercy, of the city of New York, and not a charity; for, as was well said by the Supreme Court of the United States (17 *How.*, 384, *Fountain vs. Ravenel*): "It is no charity to give to a friend. In the books it is said, the thing given

becomes a charity where the uncertainty of the recipients begins.   This is beautifully illustrated in the Jewish law, which required the sheaf to be left in the field for the needy and passing stranger."

Both of these New York claimants were incorporated under the general statute of that State of April 12, 1848, by the second section of which, it is enacted, that the associations incorporated by its provisions, " by their corporate name, shall, in law, be capable of taking, receiving, purchasing, and holding *real estate*, for the purpose of their incorporation, and *for no other purpose, to an amount not exceeding the sum of fifty thousand dollars in value, and personal estate, for like purposes, to an amount not exceeding the sum of seventy-five thousand dollars in value ;* but the clear annual income of such real and personal estate shall not exceed the sum of ten thousand dollars."

The sixth section of said statute authorizes the corporations, which may be organized under its provisions, to hold, by devise or bequest, real or personal estate, the clear annual income of which shall not exceed ten thousand dollars, provided that not more than a fourth of testator's property be so devised or bequeathed if he leaves wife, child, or parent, and the will shall be executed at least two months before the testator's death.

. This section, however, does not enlarge the capacity of the corporation to hold more than fifty thousand dollars' worth of real estate, nor more than seventy-five thousand dollars' worth of personalty ; but it does give them legal capacity to hold, by devise and bequest, these amounts, which they could not without said provision, because of the general prohibition contained in the New York statute of wills : " That no devise to a corporation shall be valid unless such corporation be expressly authorized by its charter, or by statute, to take by devise."   (2 *N. Y.*

*R. Stat., p.* 57, *sec.* 3 ; *also Downing vs. Marshall,* 23 *N. Y. R.,* 375.)

As said by *Angell & Ames on Corporations, section* 111 : " The Legislature may create a corporation, not only without conforming to the rules of the common law, but in disregard of them; and when a corporation is thus created, *its existence, powers, capacities, and mode of exercising them, must depend upon the law of its creation, and upon its objects.*"

The State of New York has, perhaps, manifested a more vigilant jealousy, both through her legislative and judicial departments, than any other State of the American Union, against the accumulations of large landed estate by her corporations, and especially those of religious and charitable objects, as the experience of European civilization has, perhaps, taught all observant minds the great detriment to the general prosperity of the people in permitting such corporations to accumulate and hold in perpetuity the real estate so essential to the encouragement of labor generally. And Kentucky, by her statute on charitable uses, has manifested the same general spirit.

Under the statutes of New York, including the one of their creation, neither of these corporations can hold exceeding fifty thousand dollars in value of real estate; that amount exhausts their full legal capacity to take or hold by purchase, devise, or otherwise; and if these institutions owned that much at the death of the testator, they can take no part of his real estate. The words of the statute under which these corporations are created being prohibitory, they not only lack the capacity to hold more than fifty thousand dollars' worth of real estate, but are prohibited therefrom.

This is a devise directly of the half of his residual real and personal estate, to be divided within two years, or afterwards to be sold and the money to be divided. It conferred no power on the executors to sell, but the real estate went at once and directly to the devisees, with immediate power in them to divide it, else to sell after the lapse of two years and divide the money.

The annual reports of the Episcopalian "House of Mercy," from the year 1860 down to 1866, are made part of the evidence, and are part of the record of the case. From these, it appears that, as early as March 3, 1860, "ten lots go with the house, the plat being five lots one hundred and twenty-five feet wide, and running through from Eighty-sixth to Eighty-fifth streets. *The house alone cost originally near fifty thousand dollars, and is now in very respectable repair.*" Its liabilities were then set down at ten thousand three hundred and seventy dollars and seventy-seven cents. The report of March 1, 1861, shows a reduction of the floating debt of one thousand five hundred dollars, and an accumulated fund of eight hundred dollars to go towards a reduction of the mortgage of six thousand dollars. It states also that "the repairs already alluded to have added much to the comfort and the good appearance of the building."

The annual reports of 1862 and 1863 indicate but little additional resources; but that of 1864 was highly encouraging; for, as it states, "during the session of the Legislature last winter, Mrs. Richmond, by her untiring exertions in our behalf, succeeded in obtaining a grant of fifteen thousand dollars to pay off the debts of the institution. The mortgage on the house has been accordingly discharged, and the money so generously let to us by Mrs. Richmond has been paid." This report shows the other donations and expenditures; and, after expend-

ing one thousand and fifty-five dollars and ninety-seven cents in furnishing the house, left a balance unexpended of nine hundred and twenty-three dollars and twenty-four cents.

This report further shows, from the treasurer of the building fund, that, after paying the mortgage of six thousand dollars, the debt to Mrs. Richmond of two thousand nine hundred and seventeen dollars and sixteen cents, and the interest account, there remained in his hands five thousand and thirty-five dollars and twenty-two cents. The subsequent reports show large additions to the furniture of the house and an additional purchase of eight lots adjoining the ten already owned, with balances still in the treasurer's hands. So, at the death of Cromie, there can be no doubt but the real estate of this institution was worth at least fifty thousand dollars, free of all encumbrances.

The evidence as to the Catholic "Institution of Mercy" is not quite so certain and satisfactory; still it appears that their real property was in a more dense populated part of the city, and included not only the Convent of St. Catherine's, the Home of the Sisters of Mercy, but also the building wherein they dispensed their charity to the poor females under their protection, now styled by them their "House of Mercy;" and we infer from the proof that it was better located, a finer building, with greater accommodations, than the Episcopalian institution, and worth probably more than fifty thousand dollars, and no encumbrance on it so far as the evidence shows; hence, neither of these institutions can participate in the residual devise as to the real estate of testator.

There is nothing in the record to show the amount of personalty owned by these institutions, but we may presume that a large amount of valuable furniture is owned

by each as indispensable to the conducting of their busi-
ness and purposes.

It is insisted, however, by the heirs, that, as these are
foreign corporations, they should show capacity to take;
but, as they do show by the laws of their creation a
capacity to take and hold seventy-five thousand dollars
of personalty, we cannot, in the absence of proof, pre-
sume that they have this amount, and therefore no right
to demand this personal legacy; nor does the proof show
the amount of the residual personal estate bequeathed.
The pleadings do exhibit that it is a large estate.   In the
argument it has been stated as consisting of a house and
lot in Louisville, sold at some twenty-seven thousand
dollars, fifty thousand acres of Texas lands, and some
two hundred thousand dollars of personalty, whilst the
specific legacies amount to less than twenty-five thou-
sand dollars.   As the legatee, whichever it may be, can,
therefore, take of this personal estate so far as it may
lack of having seventy-five thousand dollars' worth of
personalty, we are called upon to determine which of
these claimants is the rightful beneficiary.

A somewhat embarrassing question is to determine
which of those institutions the testator intended as the
recipient of his bounty.

Isaac Cromie was born of Presbyterian parents, in the
North of Ireland; was a Protestant in faith, and strongly
and persistently anti-Catholic.   He was a devoted and
persistent Free Mason.   In politics, strongly and radi-
cally Union, and co-operated with the Republican party.
Entertaining strong prejudices and partialities, he was
tenacious of his opinions and sentiments; warm in his
friendships, and bitter in his resentments.   There were
some seeming inconsistencies in his conduct; but these
were, perhaps, more apparent than real.

Differences in opinion as to religion, politics, or other things, seem not to have disturbed his intimate personal relations with those, he liked and had confidence in; whilst agreement in these things seems not to have shielded from his asperities those he personally disliked, or whom he thought had, in anywise, mistreated him; hence, he married a Catholic wife, after the rites of the Roman Church, and had her buried according to the rites of the church. One of the largest specific legacies he left to a Catholic lady, Mrs. Mortensen. Whilst he seems to have admired the benevolence of the Catholic sisters of different orders, yet he seems also to have been uncharitable in some of his views toward them, and was bitterly opposed to the Roman Catholic religion.

Whilst a devoted and active Mason, contributing largely to the material welfare of the fraternity in Louisville, yet he had difficulties with some of the order, and disliked them very much. Though a Protestant and Presbyterian in faith, yet he regarded himself as mistreated by them; therefore, thought some of them hypocrites.

Though radically Union in politics, and strongly opposed to the rebellion, yet, personally, he liked some of the rebels; and the two most confidential physicians who attended him in his last illness, were, the one from the rebel army, and the other a strong sympathizer with the Southern cause. And though, but for the provision in his will, we could not certainly tell that he knew there was a House of Mercy in the city of New York, yet, as he was an intelligent man, and, some years before making his will, had inquired of a friend why the Protestants had no Magdalen institution similar to that of the Catholics; and being answered that the Episcopalians had such a one in the city of New York, and

as the Episcopalian House of Mercy had from one thousand five hundred to two thousand of its annual reports distributed, and as he had been a regular subscriber to the New York Times, a daily newspaper, published in the city of New York, and as his will attests, beyond all paradventure, that he did know of a "House of Mercy," located in said city, it may be presumed that he had, through some source, derived information satisfactory to himself of such an institution; and that it was the Episcopalian one, now claiming the bequest, seems quite probable, not only from the foregoing facts, but other considerations. Had he designed to bestow this legacy on a Catholic institution, there is perceived no tangible reason why he should leave such institutions of his own city, where he had spent the days of his manhood, and accumulated his large fortune; had found his wife of this faith, and sought a stranger institution in a foreign city. If he desired to bestow upon a Catholic Magdalen house, there was one hard by his dwelling; if he desired to bestow it upon a Catholic charity for the benefit of the virtuous poor, he need not have left his own city; if he desired to bestow it upon the Catholic Sisters as a testimonial of his high appreciation for their devoted and charitable services rendered during the war to the wounded and sick and distressed soldiers, such were his immediate neighbors.

If, on the contrary, he desired to bestow it upon a Protestant Magdalen institution, none such were to be found in his own city, and he must needs seek it among strangers, and, in so doing, he did find "The House of Mercy, of the city of New York." Here was located "The House of Mercy, New York," so described and known in its charter, and bearing this corporate name, so published in its reports, and so known on the records of the

courts and in the legislative proceedings of the State. The Catholic claimant took out its charter one year previous to that of the Episcopalian, and, of its own volition, gave it the baptismal name of "Institution of Mercy," and, as such, it was known on the records of the State, and through its reports; and whilst, in some of its printed documents, that branch wherein charity was dispensed to poor and destitute virtuous females was styled "The House of Mercy," yet, in the Catholic "Almanac and Ordo" it was called the "House of Protection;" and its designation as "The House of Mercy" seems to have been entirely local to the immediate community in which it was situated, for we cannot find in the record that it was so known in Louisville, even among the various orders of sisters, the clergy, or laity of the Catholic church. Whilst, in the "Episcopalian Church Almanac," this Episcopalian institution is designated as "The House of Mercy;" besides, the near identity of name is, in itself, very persuasive, and, when connected with the other facts, incidents, and considerations, becomes controlling.

If the words "House of Mercy" be considered as descriptive of the name, and the words "of the city of New York" be regarded as designating the locality, as they should, then this claimant comes fully within the rule as stated in *Angell & Ames on Corporations,* section 99, before quoted; because, as corporate names frequently consist of several descriptive words, it is not essential, in deed or will, to use all of them, nor that they should be used in the exact order of the corporate name.

Cromie, undoubtedly, left this bequest to some institution or artificial being, located in the city of New York, known to him as "The House of Mercy." In a mere contest between the heirs-at-law and this Episcopalian

institution, without any evidence but that of its own charter, can there be any doubt that the identity, or approximate identity, of the corporate name of this claimant, and that designated in the will, would have been, *prima facie*, sufficient to establish it as the valid claimant of the bequest? If this be so, and we think it is, then it is incumbent on "The Institution of Mercy" to overcome, by evidence, all the fortifying circumstances in favor of "The House of Mercy, New York;" and also *this legal prima facie presumption in its favor*, which we think, so far from having been done by the evidence of either or all the parties combined, that this goes to strengthen it; and, as "The House of Mercy, New York," could claim without the aid of extrinsic evidence, other than the law of its own being, the legality and propriety of such evidence may, perhaps, be questioned. But this is not necessary to be considered. Whilst "The House of Mercy, New York," is thus ascertained to be the legatee, still it can only receive to the extent of its legal capacity to take and hold not already satisfied by its possessions at the time of Cromie's death, its original and entire capacity, as to personalty, being seventy-five thousand dollars in value; and, as it may already possess a large part of this amount, its legal capacity to hold this bequest will be correspondingly reduced; and, as the amount of the bequest may be greatly over what the legatee can legally take and hold, the question should be referred to a master to ascertain what amount of unencumbered personalty, in value, was owned by "The House of Mercy, New York," at the time of Cromie's death; and such amount of this bequest should be paid over to it, not exceeding seventy-five thousand dollars, as it may lack of then owning of personalty that amount, as authorized by its charter. As it cannot take the de-

vise of real estate, because it already possesses as much as its charter authorizes, and as it can only take such an amount of the personal bequest as will, when added to what it then owned of personalty, make seventy-five thousand dollars, deducting its indebtedness therefrom, Isaac Cromie must be regarded as dying intestate as to such real estate, and the residue of the personalty; and which real estate must be regarded as descending to his heirs-at-law; and the personalty still remaining in his executor's hands, after the payment of all the indebtedness of the testator, and the specific legacies, and the residual legacy to "The Louisville Orphans' Home Society," and to "The House of Mercy, New York," what it may be entitled to, must be paid over to the distributees of decedent Cromie, according to the laws of Kentucky.

Wherefore, the judgment of the chancellor should be reversed on the appeal of the heirs-at-law against "The Institution of Mercy," also on the appeal of "The House of Mercy, New York," against it, and affirmed on the appeal of the heirs-at-law against "The Louisville Orphans' Home Society;" and, as between the heirs-at-law, the executors, and "The House of Mercy, New York," further proceedings should be had as herein indicated, and judgment in bar rendered against "The Institution of Mercy."