CASE 46—PETITION BY THOMAS F. COLEMAN AND OTHERS V. JOHN D. O'LEARY'S EXR. AND OTHERS, TO HAVE CERTAIN CLAUSES OF DECEDENT'S WILL DECLARED VOID.—DEC. 17.

# Coleman, &c. v. O'Leary's Exr., &c.

APPEAL FROM JEFFERSON CIRCUIT COURT, LAW AND EQUITY DIVISION.

FROM THE DECREE RENDERED PLAINTIFFS APPEAL. REVERSED.

WILLS—TRUSTS—CONSTRUCTION—CHARITABLE USES—PERPETUITIES— BEQUEST FOR MASSES—BEQUEST FOR SCHOOL CHILDREN—FOR POOR PEOPLE—TRUSTEE—SELECTION OF CO-TRUSTEE—UNASCERTAINABLE OBJECT—BENEFICIARIES—OBJECT OF TRUST—LOCATION— ENFORCEMENT—RIGHTS OF HEIRS—APPEAL.

Held: 1. The validity of a will is to be determined under the statute in force at the time of the testator's death.

2. A bequest in trust for masses for the repose of testator's soul was valid, being enforceable on application by the heirs, and was not void as a private trust, contravening the doctrine of perpetuities.

3. A bequest of a certain sum, "to be invested, and the income of which to be applied in rewards of merit to pupils in the parochial poor schools in L.," was certain and valid.

4. To a bill praying that a will be adjudged void, a defendant who was a beneficiary under a certain clause demurred, and another, who was beneficiary under another clause, answered. A demurrer to the answer was carried back to the petition, and it was dismissed absolutely. HELD that, though the court did not rule on the defendant's demurrer, it having held all the clauses valid, and dismissed as to all, the court on appeal would consider the case of the demurring defendant.

5. A bequest to one, "to be applied to any charitable uses, and so as to do most good, in his judgment," is invalid.

6. A bequest to the Jesuit order "for the purposes of education or religion" was invalid, as not to "an identified or ascertainable object."

7. A bequest in trust to a certain person, "and three others to be chosen by him," was not objectionable for the power given to the trustee named to select his colleagues.

8. Under Const., 1799, art. 6, section 8, adopting the general laws of Virginia, which included English statutes made in aid of the

common law prior to 4 Jac. I., "which are of a general nature, not local to that kingdom," the adoption thereby of St. 43, Eliz. c. 4, relating to charitable trusts, included more than the preamble thereof, and conferred on the courts a corrective and remedial power in the administration of such trusts; such power having been directly exercised by the English courts after the enactment of the statute, without the intervention of the commissioners provided by it.

Act 1852 (1 Rev. St., p. 235), permitting bequests in trust "for the relief or benefit of aged or impotent and poor people," which succeeded 43 Eliz., c. 4, adopted by the State, in which the words were, "for relief of aged, impotent and poor people," did not change the meaning, and does not require that the "poor" who may be beneficiaries of such trust must be old or impotent, but those who need assistance; and a bequest for founding a home for "poor" men was not uncertain.

10. A bequest in trust for the establishment of a home for poor men was not uncertain because no one was given power to select the objects of the charity, as the trustees would have authority to act in the management under the direction of the chancellor.

11. A residuary bequest in trust to the "Bishop of the Catholic Diocese of Louisville, . . . for the establishment of a home for poor Catholic men," was not void for being indefinite as to the location in which the home should be established, and from which the beneficiaries should be selected, as, under 1 Rev. St., p. 236, section 2, providing that equity may uphold a charitable trust by taking control of the fund, and directing its management, and settling who is the beneficiary thereof, the will would be construed as requiring the establishment of the home in Louisville, and the selection of beneficiaries from that diocese.

12. To the extent that testator's heirs knowingly permitted the executors and trustees under void clauses of his will, attempting to create charitable trusts, to proceed with the execution of the will as if valid, and to expend the fund for the benefit of the supposed objects of charity, no recovery can be had by them; nor, if investments have been made in execution of the supposed purposes of the void clauses, can recovery be had for the loss, if any, occasioned by such re-investment.

D. W. SANDERS AND J. W. S. CLEMENTS, ATTORNEYS FOR APPELLANTS.

1. It is a well recognized principle of equity that no trust shall fail for the want of a trustee, so that when this provision was placed in our statute of charities it was only declaring the

law as already settled.    It is an equally well settled princi-
ple that there can be no trust at all without a *cestui que trust,*
or beneficiary.  Without this element there is no trust for a
trustee to uphold.  The indispensable elements of a trust are,
(1), the declaration or creation of the trust by the donor, (2),
a fund or property to pass and (3), a beneficiary or *cestui.*
The trustee is a secondary matter; he can always be supplied.
The beneficiary must either be pointed out with such cer-
tainty that his identity may be judicially determined, or the
creative language of the trust must indicate some condition or
circumstance from which a court may arrive at certainty.  *Id
est certum quod redi potest certum.*    Now, upon this general
law of private trusts has been superimposed charitable trusts
and public or merely humane trusts.  The difference between
a private trust and a charitable trust is simply this:    In a
private trust the individuals are named or so designated that
they can be judicially  ascertained as individuals;  in  other
words individual  personality  characterizes the  beneficiaries,
while in the charitable trust personality is ignored and the
misfortune or condition provided for is the prevailing idea,
whenever it may be manifest in any individual who comes
within the class designated by the donor in a general way. In
the latter the idea is civic and impersonal.  A devise to any
number of designated poor orphans in trust is merely a pri-
vate trust and is void as a perpetuity, unless limited within
the statutory period.  A devise in support of one's destitute
descendants and their children is not a charity and is void as
a perpetuity.    Kent v. Dunham, 142 Mass., 216.    There is
great confusion in the decisions as to the extent of lax con-
struction that courts should adopt in upholding vague charita-
ble devises.    Sentimentality has too often taken the place of
logic and law in the decisions of these questions.    The ques-
tion is not whether our courts will uphold indefinite charita-
ble devises, for all charity devises are necessarily indefinite,
but whether or not there is a limit in vagueness, beyond which
our courts will refuse to go.

2. The devise must name an object—as a church, orphan asy-
lum, school or the poor of a certain municipality, or it must
name a class of objects generally with power to some one to
select the particular object or objects from a designated class as
to the schools of a State or nation of a certain kind, or to the
charitable institutions of a State or municipality or diocese or
church organization, with power to trustee to select the par-
ticular institution or institutions, etc.    The reason for this is
very clear.

Coleman, &c. v. O'Leary's Exr., &c.

There must be that reasonable certainty necessary to enable a court judicially to enforce the charity.   In other words some reasonable ascertainable beneficiary that can come into a court as plaintiff and ask for and have enforced the charity. There can be no trust without some sort of reasonably ascertainable *cestui que trust*.   If the gift be to the poor of some municipality, either it or some poor person resident could ask the court to enforce the trust, but when no place, State, nation or town is named then this is no longer possible, for if a Kentuckian asked the enforcement of the devise, a Hindoo or Chinese could appear and make equally as good a claim, hence such a vagueness renders the devise void for the court could not know from the will what locality was to be the home of the beneficiaries.   Even Perry in his essay in favor of the English-Massachusetts idea admits that such is the American rule, but he does so grudgingly.   See recent edition, section 713.

3. We beg the court to notice the material difference between the statute of Elizabeth and our own.   In that statute the language is "for relief of aged, impotent and poor people;" while in our statute, the language is "for the relief or benefit of aged, or impotent and poor people."   Now, the devise in question names a home "for poor Catholic men," and while it might have been upheld under the language of the old statute it plainly can not be under ours.   Our law makers very wisely determined to provide that the rich, though old or impotent, were not objects of charity, and especially, too, that the poor, unless they were also either old or impotent could not be objects of charity.   The material difference renders the *cy pres* authorities relied on entirely worthless.

4. The court below in his thick and thin defense of *cy pres* overlooks the obvious distinction between a gift to the organized charities of a church to an organized asylum, college, school or to a State, county, city or town for public or charitable purposes.   In all such cases the direct and legal object of the charity, the party who could come into court and have it enforced, is the organized body itself.   In all such cases, as has been often decided, the donor is conclusively presumed to have given in harmony with the purposes of the organization, so that the individuals who are taught in the churches or schools or by the missionaries, or the orphans succored are the beneficiaries only in a remote and secondary sense; but where as in case at bar a new and perpetual trust is made to establish a home for poor Catholic men, with neither home nor beneficiaries in any way designated or located, there is neither an organization, society or any individual who can come into court

and enforce the trust at all, and, hence, it is void. This is the excess of vagueness that the law will not allow, except where *cy pres* rules prevail. This distinction is too obvious to need argument.

5. In devise at bar the trustees are certain, but they are given no power at all, and no located or limited class is named from which selection could be made. This defect is absolutely fatal. The court says, further disposing of the authorities urged by counsel for appellees and court below: "If a devise is made to an association, voluntary or corporate, having its board of trustees, and organized for a known and legal purpose, such as a church or a theological institute, the law will presume that the testator intended that the trustees or regents of such association should administer the charity in furtherance of the purpose of such association, and when necessary, select the beneficiaries." See Bridges v. Pleasants, 4 Ired. Eq., 26. This obvious distinction disposes of every case cited by appellee's counsel in support of the devise at bar.

If it be possible that the trustees may misuse the fund and still, owing to vagueness, the court is unable to correct the abuse, then the devise is void, irrespective of what is or may be done. The law can not recognize a form of property that can not be controlled. It is otherwise where courts follow the *cy pres* rule, for there they can act paternally and devote the fund outright *cy pres*, and so there can be no abuse. In this State where no *cy pres* rule exists, such devises must fail.

6. We do not claim that the saying of mass for any one is an illegal thing, on the contrary it is perfectly legal, but whenever a trust is attempted to be made the usual rules must be applied. There can be no trust, of course, without a living beneficiary or the possibility of one coming into being. This can never be so of the dead and there being no trust effectual the property is undevised.

These devises are trusts or nothing. They are not charitable, first, because they name the specific disembodied souls, and, second, they name the testator's own soul, and by all authority these are not charities, neither by statute or court finding, for it is of the very essence of a charity that no specific individual is pointed out.

A dead person or persons can not be the *cestui que trust*, and, hence, the attempted trust is void. A trust will never fail for want of a trustee, but there can be no trust without a *cestui que trust*.

7. Finally, we insist we have shown from reason and authority that the residuary devise is void (1) because it does not

Coleman, &c. v. O'Leary's Exr., &c.

name a charitable object under our statute, which require that
the poor shall also be "aged or impotent," contrary to that of
Elizabeth; (2) because no power is given to any one to select the
object of the so-called charity, a thing that is always fatal to
such trusts; (3) because it fails to locate the home at any place
or give any place from which the beneficiaries are to be select-
ed; and (4) because it fails to empower any one to make such
location or selection; that the mass clauses are void because
they are not charity trusts at all, being mere private trusts
void for want of a living *cestui que trust*; that devise to the
bishop of Cork is void because no object or class of objects is
named according to the rule in the Spalding case, and that the
Jesuit devise is void, because, as held in the Tilden case, no
preference is expressed for alternate objects named, and even
the classes referred to are too· vague for judicial enforcement.
For these reasons a reversal is respectfully asked.

### AUTHORITIES CITED ON INDEFINITE DEVISES.

Grimes v. Harmon, 35 Ind., 198; Fifield v. Van Wyck, 94 Va.,
557; Spalding v. St. J., Ind., S., 21 R., 1107; Cromie v. L. O.
H. Society, 3 Bush, 374; Moore v. Moore, 4 Dana, 354; Johnson
v. Johnson, 92 Tenn., 559; Rhodes v. Rhodes, 88 Tenn., 637;
Bridges v. Pleasants, 4 Ired. (N. C.), 26; Gallego v. A. G., 3
Leigh (Va.), 450; Janey v. Latane, 4 Leigh (Va.), 327; Carter
v. Wolf, 13 Gratt. (Va.), 301; Tilden v. Green, 130 N. Y., 29;
Read v. Williams, 125 N. Y., 560; Beckman v. Bonsor, 23 N.
Y., 298; Prichard v. Thompson, 95 N. Y., 380; Kent v. Dunham,
142 Mass., 216; Dublin Case, 38 N. H., 459; Kelly v. Nichols, 21
At. R., 840; Yungling v. Miller (Md.), 26 At. R., 491; Dulaney
v. Middleton (Md.), 19 At. R., 146; Hoffman Will (Wis.), 36
N. W., 407; Moore v. Carpenter, 19 Vt., 613; Dashiel v. Attor-
ney-General, 5 Har. & John., 392; Lepage v. McNamara, 5 Iowa,
124; Garrison v. Little, 75 Ill. App., 75 Hun., 298; 66 N. W.
R., 955 Mich.; 147 N. Y., 104; 92 Hun., 96; 27 S. E. R., 446
(W. Va.), and 389; 154 N. Y., 199; 73 N. W. R., 617 (Iowa);
46 N. Y. S., 1035; McHugh v. McCole, 12 N. W. R., 631 (Wis.);
72 N. W., 631 (Wis.); 19 N. J. Eq., 453; 5 Cranch, C. C.,
632; 53 N. W. R., (Minn.), 648; Brennan v. Winkler (S.
C.), 16 S. E. R., 190; Gambell v. Tripp, A. R. L.; 19 N. Y.
S., 840; 19 N. S. R., 801; 26 N. E. R., 426; 26 N. E. R.,
730; 44 N. W. R., 304; 7 N. Y. S., 861; Bristol v. Same, 53
Conn., 242; 64 Md., 333; 31 Minn., 173; 56 Md., 362; Kain v.
Gibbony, 101 U. S.; A. G. v. Soule, 28 Mich., 153; 8 Md., 557;
31 Conn., 407; 24 Conn., 350; 22 Conn., 31, 54 and 55; 30
Conn., 113; 4 C. E. Green (N. J.), 255; 40 Wis., 29; Wheeler

v. Smith, 9 How., 55; 3 Fed. Cas., 783; 17 How. (U. S.), 368; Masses: Festorazzi v. St. Jos. Cath. Ch., &c., 104 Ala., 327; Holland v. Alcock, 16 N. E., 305 (N. Y.); Swartz Will, N. Y. S., 134; McHugh v. McCole, supra; Morrow v. McConville, L. R., Irish XI., 236; Dorrian v. Gilmore, L. R. Sr. XV., 69, and Dillon v. Reilly, I. R., 10 Eq., 152; Blundell's Will, 30 Beavan, 360; Attorney-General v. Dulaney, Irish, 10 Com. Law, 104. School Devise: Goodell v. Un. Ass. &c., 29 N. J. Eq., 32; Ky. Stat., Morehead & Brown, Stat. vol. 1, 308. As to one representing class: 17 B. M., 499; 4 Bush, 215; 8 B. M., 70, and 1 Bush, 307; Civil Code, sec. 25.

P. B. & UPTON W. MUIR, FOR APPELLEES.

## CLASSIFICATION REQUIRED BY RULE 17.

1. What act in force.    The present statute of charitable uses and trusts was not in force at the death of testator, O'Leary. Therefore, the act found in the General Statutes, page 242, must govern. Crawford v. Thomas, 21 Ky. Law Rep., 1100.

2. Effect of demurrers.    The validity of the contested bequests was properly decided on the demurrers by appellant to defendants' answers, as by a rule of pleading, universally recognized, said demurrers were carried back to the plaintiffs' petition, and sustained as to it. All works on pleadings so teach.

3. Masses.    The bequests for masses are valid public charitable bequests.    The mass defined and sustained by overwhelming authority. Gass & Bonta v. Wilhite, 2 Dana, 182; Siebert's Appeal (Penn.), 6 Atl. Rep., 105; Rhymer's Appeal, 93 Penn., 142; Jas. Schouler, petitioner, 134 Mass., 426; Seda, et al. v. Huble, 75 Iowa, 429; Moran v. Moran, 104 Iowa, 216; Harrison v. Brophy (Kansas), 40 L. R. A., 721; Hoeffer v. Clogan, 171 Ill., 452, and cases cited by the court; Kerrigan v. Tabb and others (New Jersey), 39 Atl. Rep., 701; Sherman v. Baker (R. I.), 40 L. R. A., 718; Kimball Webster, executor of Jas. Ryan v. Sughrow, etc.    (N. Ham.), 48 L. R. A., 100; Elmsley v. Madden, 18 Grant's Chy. Rep., Ontario, 386; Atty. Gen. v. Hall, Ireland, decided in 1897; (Cited in the Illinois case.)

Contra.    The cases of Festorazzi v. St. Joseph's Catholic Church, 104 Ala., 327, and McHugh v. McCole, Wisconsin, examined.    The former (the chief justice dissenting) shown to be based on a misapprehension, and the latter to be based entirely upon a local statute.    But even that case was disapproved and practically overruled by the same court in a very able opinion rendered in 1900 in the case of Harrington v. Pier, 50 L. R. A., 318-319.    I hope the court will find time to read the opinion.    It sustains devises for masses, and indeed, so far as

our clients are interested, every contested devise in this case. It is true the chief justice dissented, but not on that point. The Festorazzi case is then the only one against the validity of masses in the United States.   And it was based upon two fatal mistakes, as shown in the brief.

4. Bequest for "rewards of merit," etc., 11th clause:   "I give and bequeath to the Rt. Rev. Roman Catholic Bishop (for the time being) of Louisville the sum of $3,000, to be invested, and the income of which to be applied in rewards of merit for the pupils in the parochial poor schools of Louisville."

We have found no authority against this bequest, and can conceive of no reason which can be urged against its validity. We therefore only cite in support of it the will of Dr. Franklin, and the cases Almy v. Jones, 17 R. I., 270, and Palmer v. Union Bank, 17 R. I., 630. That it is a valid public charitable bequest there can be no doubt.

5. Residuary clause, 20th clause:   "All the remainder of my estate after the payment of the specified legacies and bequests I wish to be invested and placed in trust with the Rt. Rev. Bishop of the Catholic Diocese of Louisville and three others to be chosen by him for the establishment of a home for poor Catholic men, as soon as the proceeds of my estate may justify it."

(a) The power conferred upon the Bishop to appoint three associates valid. Dudley v. Weinhart, 93 Ky., 403; Crawford v. Thomas, 21 Ky. Law Rep., 1100; Lillard v. Robinson, 3 Litt., 415; Herbert v. Herbert, Wright, etc., 85 Ky., 134; Miller v. Teachout, 24 Ohio St., 535; Hertz v. Abraham (Ga.), 50 L. R. A., 361.

(b) This is a public charitable bequest, and is valid, both at the common law and by our statute. General Statutes, Charitable Uses, 242; Prof. Ames, 5 Harvard Law Review, 390; Snug Harbor Case, 3 Peters, 99; Russell v. Allen, 107 U. S., 163; Chambers v. St. Louis, 29 Mo.; Dye v. Beaver Creek Church (S. C.), 26 S. E. Rep., 717; Perry on Trusts, sec. 687, etc.; Harrington v. Pier (Wisconsin, 1900), 50 L. R. A., 307; Moggridge v. Thackwell, 7 Vesey, 86; Porter's Case, 1 Coke, 17; Judge Story in Appendix to 3 Peters, 499; Vidal v. Girard's Executors, 1 How., 183; Gass & Bonta v. Wilhite, 2 Dana, 170; Moore's Heirs v. Moore's Devisees, 4 Dana, 366; Curling's Heirs v. Curling's Administrator, 8 Dana, 38; Chambers v. Baptist Educational Society, 1 B. M., 214; Attorney General v. Wallace, 7 B. M., 617; Cromie's Heirs v. Louisville Orphan Home, 3 Bush, 365; Peynado v. Peynado, 82 Ky., 13; Leed's v. Shaw's Admr., 82 Ky., 79; Kinney v. Kinney, 86 Ky., 610; Pen-

ick, Rector, v. Thom's Trustee, 90 Ky., 668; Ford v. Ford, 91 Ky., 572; Given's Admr. v. Shouse, 5 Ky. Law Rep., 419; Tichenor v. Brewer, 17 Ky. Law Rep., 936; Bedford v. Bedford, 18 Ky. Law Rep., 195; Crawford v. Thomas, 21 Ky. Law Rep., 1100; Spalding's Heirs v. St. Joseph's Industrial School, 21 Ky. Law Rep., 1107. This last case is cited only to show that it is entirely consistent with all the foregoing bequests.

6. Charity generally, 12th clause: "I give and bequeath to the Rt. Rev. Roman Catholic Bishop (for the time being) of Cork, Ireland, the sum of $3,000, to be applied to any charitable uses and so as to do most good, in his judgment."

This is a valid bequest, sustained by all the Kentucky cases (except the Spaulding case), including the case of Crawford v. Thomas. All the authorities cited under other heads; also Erskine v. Whitehead, 84 Ind., 358.

7. Visitorial rights. Heirs will not be heard unless there has been "some abuse of the trust or some failure to execute it." Atty Gen. v. Wallace, 7 Ben. Mon., 621. No such abuse or failure has been alleged, or could have been truthfully alleged. The trust was executed before this suit was filed.

8. The prerogative and *cy pres* doctrines. There is no reason whatever for invoking or discussing either of these doctrines in this case. Neither of them has been invoked by us, for there is nothing in this case to call for the discussion or application of either. We have no need of them, nor any use for them, or for any English or American case influenced by either of them. All this is fully shown in the brief. All that has been said on this subject is therefore wholly irrelevant. I will not, however, complain of Brother Clements for calling every case against him a "*cy pres*" and every law-writer who states the law against him another "*cy pres*," provided he will solemnly promise never to be so angry with me as to call me a "*cy pres*."

As this "*cy pres*" doctrine is treated by Chief Justice Woods and to the extent that it is purely "judicial," it is not objectionable. He excludes prerogative from it and leaves it simply and "in effect a liberal rule of construction." Erskine v. Whitehead, 84 Ind., 358; 2 Perry on Trusts, sec. 727.

C. B. SEYMOUR AND C. C. MATTINGLY, ATTORNEYS FOR JAS. M. HAYES, AN APPELLEE.

### SYNOPSIS.

1. A defendant can not be compelled against his will to become a plaintiff and to sue himself and others. Code, section 25.

Coleman, &c. v. O'Leary's Exr., &c.

2. A bequest to a priest for masses to be said is a valid charity.    Cases cited in note to Moran v. Moran, 4 Am. and Eng. Dec. in Equity, p. 41.

SAM J. BOLDRICK, WARNING ORDER ATTORNEY FOR THE SOCIETY OF JESUS AND BISHOP OF CORK.

The importance, always recognized, of protecting the individual rights of every person to devote his private fortune to the public good so far as practicable without the violation of any legal principle, and of making all efforts to that end effective to accomplish the donor's purpose, can not be overestimated. Few things occur in the administration of justice more lamentable than the occasional strangling of some wise and noble purpose to devote the savings, or part of them, of a life of industry, to the upbuilding of the human race at some point or in some field and the diversion of what was intended for some public benefit to private use, directly contrary to the will of him whose last days were solaced with the thought that his public benefactions would build an enduring monument to his memory in the hearts of grateful people, and the hope of eternal reward for such well doing, believed to be waiting for bestowal. That idea prevailed when the fathers of the common law so far back that neither the memory of man nor judicial records run to the contrary. It became crystallized as part of the common law of England long prior to the statute of 43 Elizabeth, chapter 4, to the effect that gifts to charitable uses should be highly favored and construed by the most liberal judicial rules that the nature of each case as presented would admit of, rather than that the gift should fall and the intent of the donor fail of accomplishment.

If it should be contended, which it is not, because the question is settled in Atty. Gen. v. Wallace, 7 B. Mon., that the trustee, of the Society of Jesus, is incapable of taking, it would not make the devise void, but the court would simply appoint a trustee, the doctrine applying that a trust for charity never fails for want of a valid or competent trustee; but this question is not raised.

I was appointed warning order attorney also for the bishop of Cork, Ireland, one of the devisees, but as the executor has long since paid him, the plaintiff will have to go to Ireland to sue.

But as far as the Society of Jesus and the bishop of Cork are concerned, their case is not before the court, because the warning order attorney filed demurrers for each to the petition, and while the court declared these devises good, the

judgment neither overrules nor sustains either one of these demurrers, but only carries bock the demurrers of plaintiff to the petition of those who filed answers, (viz., Hayes and Judge Muir's clients), leaving the demurrers of the society and the bishop, undisposed of. Undoubtedly, the plaintiff does not care to push these devises, but is interested mainly in the bulk of the estate which goes to Bishop McCloskey, trustee; therefore, all this court can do 'is to dismiss the appeal as to the Society of Jesus and the bishop of Cork, because it has never been perfected.

## AUTHORITIES CITED.

Constitution of Ky., 1799, art. 6, sec. 8; Morehead and Brown Statutes, vol. 1, p. 612; Morehead and Brown Statutes, vol. 1, p. 308; General Statutes, 242; Pomeroy's Eq. Juris., vol. 2, sec. 1028, note 3; Moore v. Moore, 4 Dana, 359; Spalding v. St. Jos. Ind. School, 2 Ky. Law Rep., 1107; Bispham Equity, p. 168; Pomeroy Equity, vol. 2, secs. 1023-1021; Bouvier Law Dictionary, for "or" and "and;" Lichfield v. Cudworth, 15 Bick., 27; U. S. v. Fisk, 3 Wall., 447; Dumont v. U. S., 98 U. S., 143; John v. Smith, 102 Fed. Rep., 218; Erskine v. Whitehead, 84. Ind., 359; Phillips v. Harrows, 93 Iowa, 92; Harrington v. Pier, 105 Wis., .485; In re Upham's Estate, 59 Pac. Rep., 315; In re Upham's Estate, 46 Ga., 88; In re Upham's Estate, 83 Ala., 299; In re Upham's Estate, 39 La., 1043; Kinney v. Kinney, 86 Ky., 610; Atty. Gen. v. Wallace, 7 B. Mon., 617.

OPINION OF THE COURT BY JUDGE DURELLE—REVERSING.

This appeal is to determine the validity of six clauses of the last will and testament of John D. O'Leary, a respected citizen and resident of Jefferson county. The will was a holograph. Certain of its provisions were held by the county judge to have been canceled and revoked. With the exception of the canceled clauses, it was admitted to probate. Appellant Thomas F. Coleman, suing for himself and for the heirs at law of John D. O'Leary, as a class, filed his bill, praying that the will be adjudged void as a whole; that the devises contained in each of the six clauses mentioned be declared void; that the estate be adjudged to be undevised estate, which descends to the heirs at law; and

for a settlement and distribution of the estate. As alternative relief, the bill prayed, in the event any or all the trusts provided in the disputed clauses should be held valid, that the trustees be required to carry out the same. An answer was filed, and a demurrer to the answer was carried back to the petition and sustained. The question before us, therefore, is as to the sufficiency of the petition attacking the validity of the contested clauses. These clauses are as follows:

"Clause 4. I give and bequeath to the Rt. Rev James M. Hayes, S. J., Chicago, Ill., the sum of $3,000 for masses for the repose of the souls of my mother and my aunts, Ann and Ellen, and my own."

"Clause 11. I give and bequeath to the Rt. Rev. Roman Catholic Bishop (for the time being) of Louisville the sum of $3,000, to be invested, and the income of which to be applied in rewards of merits to pupils in the parochial poor schools in Louisville.

"Clause 12. I give and bequeath to the Rt. Rev. Roman Catholic Bishop (for the time being) of Cork, Ireland, the sum of $3,000, to be applied to any charitable uses, and so as to do most good, in his judgment.

"Clause 13. I direct my executor to expend the sum of $1,000 for masses for the repose of my soul and those of my mother and aunts, to be said at the cathedral, Louisville."

"Clause 20. All the remainder of my estate, after the payment of the specified legacies and bequests, I wish to be invested and placed in trust with the Rt. Rev. Bishop of the Catholic Diocese of Louisville, and three others to be chosen by him, for the establishment of a home for poor Catholic men, as soon as the proceeds of my estate may justify it."

"Clause 22. I give and bequeath to the Order of the Society of Jesus, known as the 'Jesuit Order,' one hundred acres of land, at or near my place, Doneraile, in Jefferson and Bullitt counties, for the purpose of education or religion; they to have the privilege of selection on any lands on the west side of the Louisville & Nashville Railroad right of way."

The questions, therefore, to be determined by this court, involve simply the validity of these clauses. These questions are to be determined, not under the present statute, which, as amended, was approved May 12, 1893, and became a law October 10, 1893 (Kentucky Statutes, section 317 *et seq.*), but, as the testator died on May 14, 1893, must be determined by the statute in force at that time (General Statutes, p. 242, which is a re-enactment of 1 Revised Statutes, c. 14, p. 235). Crawford's Heirs v. Thomas (21 R., 1100) 54 S. W., 197.

We shall first consider the clauses directing expenditures for masses for the repose of the souls of the testator and certain named relatives, being clauses 4 and 13 of the will. These clauses undoubtedly express, definitely and distinctly, the intention of the testator. Indeed, the very certainty of the beneficiaries under these clauses is made the ground of attack, for there is no suggestion in this court either that they are void because of being indefinite, or as being bequests for superstitious uses; but the ground urged is that, being gifts to named persons for the benefit of the souls of the testator and of designated persons, these devises are not charities at all, but private trusts, and therefore void, as contravening the doctrine of perpetuities. The trustee in the fourth clause, who is also one of the heirs at law of testator, has filed an answer, stating want of knowledge as to whether any of the devises in the will is void for uncer-

tainty or any other reason, but averring that, if any of the
devises shall be held void, he is willing that the amounts
received by him be credited on his interest in decedent's
estate.    The attack upon these mass cláuses is based es-
pecially upon the case of Festorazzi v. St. Joseph's Church,
104 Ala., 327, 18 South, 394, 53 Am. St. Rep., 48, citing, al-
so, Holland v. Alcock (N. Y.) 16 N. E., 305, 2 Am. St. Rep.,
420; In re Schwartz's will (Sur.), 3 N. Y. Supp., 134; In re
McEvoy's Estate, Id., 207; McHugh v. McCole (Wis.), 12
N. W., 631.    In the Festorazzi case, which is reported, also,
in 25 L. R. A., 360, a devise exactly similar to those under
consideration was held to be a trust, but not a charitable
use, and, being a mere private trust, to be invalid for want
of a living beneficiary.    The New York cases upon this sub-
ject are in hopeless confusion.    The Wisconsin case cited
seems, in part at least, to be based on a local statute.    We
shall not attempt to go into an extended discussion of the
authorities upon this question.    In England, although the
statute of Elizabeth, in its enumeration of charities, has
no mention of churches, except in regard to their repair,
it has uniformly been held that gifts for the maintenance
or promotion of public worship were valid, as charitable
uses, unless contrary to the established religion.    Under
St. 23 Hen. VIII, c. 10, declaring void all "uses and intents
to have obits perpetually, or the continual services of a
priest forever," etc., gifts for the saying of masses and
prayers for the testator's soul or the souls of others were,
until the repeal of that statute, held to be superstitious
uses and void.    Perry, Trusts, sections 701, 702.    In this
country no such doctrine as the English doctrine as to sup-
erstitious uses has ever prevailed.    As judges, we have
nothing to do with creeds or their orthodoxy.    In the courts

all denominations stand upon the same footing, and are to be treated alike. As said by Mr. Perry (section 715): "In this country, where all religious denominations, doctrines and forms of worship are tolerated, or, rather protected, so long as the public peace is not disturbed, there can be, in the law, no such thing as a superstitious use." No such doctrine is invoked on behalf of appellants. The validity of the bequests is to be tested by the same principles that would be applied to a devise in aid of the religious observances of any other denomination. The mass, according to Webster's International Dictionary, is "The sacrifice in the sacrament of the eucharist, or the consecration and oblation of the host." It is as we understand it, a public service—a public act of worship—by which, according to the tenets of the Roman Catholic Church, the priest who celebrates it "helps the living and obtains rest for the dead." As said by the court in Hoeffer v. Clogan, 171 Ill., 462, 49 N. E., 527, 40 L. R. A., 730, 63 Am. St. Rep., 241: "It is intended as a repetition of the sacrifice on the cross, and it is the chief and central act of worship in the Roman Catholic Church. It is a public and external form of worship— a ceremonial which constitutes a visible action. It may be said for any special purpose, but, from a liturgical point of view, every mass is practically the same. The Roman Catholic Church believes that Christians who leave this world without having sufficiently expiated their sins are obliged to suffer a temporary penalty in the other, and among the special purposes for which masses may be said is the remission of this penalty. A bequest for such special purpose merely adds a particular remembrance to the mass, and does not, in our opinion, change the character of the religious service, and render it a mere private benefit. And while the testator may have a belief that it

will benefit his soul, or the souls of others doing penance for their sins, it is also a benefit to all others who may attend or participate in it.  An act of public worship would certainly not be deprived of that character because it was also a special memorial of some person, or because special prayers should be included in the service for particular persons."  A gift in other respects proper for the establishment of a church would not, in our judgment, be avoided by a provision that the church should be called by the name of the testator, or that a tablet or a memorial window should be erected therein bearing his name.  Nor do we see any reason why the application of the fund to the designated purpose may not be enforced by the courts upon the application of the heir.  We are of opinion, therefore, that the fourth and thirteenth clauses of the will are not objectionable, and that the judgment of the chancellor as to them was correct.  The cases upon this subject may be found collated in an excellent note to the case of Moran v. Moran, as reported in 4 Am. & Eng. Dec. Eq., p. 55 (s. c. [Iowa] 73 N. W., 617, 39 L. R. A., 204, 65 Am. St. Rep., 443).

The next clause for consideration is clause 11, by which a trustee is selected and a trust created, the income whereof is to be applied in rewards of merit to poor pupils in the parochial schools of Louisville.  A definite trustee is selected.  The class to be benefited is plainly expressed; the intention is unmistakable; the bequest can be readily carried out by the named trustee, under the supervision of the court if necessary; and the object, plainly declared, is, in our judgment, a charitable one, within the meaning of the statute, being in aid of "schools of learning."  A similar bequest providing for prizes for essays upon medical subjects was sustained in Almy v. Jones, 17 R. I., 270, 21

Atl., 616, 12 L. R. A., 414. As to this clause, the judgment of the chancellor is affirmed.

The bequest in the twelfth clause to the Bishop of Cork, to be applied to any charitable uses, and so as to do the most good, in his judgment, is practically identical in language with the bequest which was held invalid in the case of Spalding v. Industrial School, 107 Ky., 382 (21 R., 1107) 54 S. W., 200.

The point is made by counsel who was appointed attorney to defend for the Society of Jesus and the Bishop of Cork, upon the entry of the warning order, that their case is not before this court, because, although he filed demurrers for each defendant to the petition, and the chancellor declared these devises good, the judgment of July 11, 1901, neither overrules nor sustains either one of these demurrers, but only carries back to the petition the demurrers of the plaintiff to the answers filed by Bishop McCloskey and his associates and James M. Hayes. But inasmuch as the judgment dismissed absolutely the petition of the plaintiff, and seems to intend that the petition is dismissed as to all the defendants, we have considered the case as if all the parties named as appellees were before the court, and we are of opinion that the chancellor's ruling as to this clause was erroneous.

We shall next consider the twenty-second clause, bequeathing to the Order of the Society of Jesus, known as the "Jesuit Order," 100 acres of land at or near the testator's place, "Doneraile," in Jefferson and Bullitt counties, for the purposes of education or religion, they to have the privilege of selection on any lands on the west side of the Louisville & Nashville Railroad right of way. The Society of Jesus is a religious order founded by Ignatius Loyola. It is understood to be composed of mis-

sionary and teaching priests of the Roman Catholic faith. As we understand it, there is no legally incorporated body, but the priests are bound only by their vows of poverty, chastity and obedience, and, after a second novitiate, by a fourth vow, requiring them to go wherever the pope may send them for missionary duty. They are governed by a general, and the society has been established in the United States for many years; but this record does not disclose the headquarters of the society, or the names of any of its officers. It would seem, therefore, that there is no trustee created by this bequest who can be made subject to the control of the court, and compelled to execute the provisions of the trust. The lack of a trustee, however, would be immaterial under our statute, and the trust would not be permitted to fail because an "inadequate, illegal, or inappropriate" mode of execution had been prescribed, provided the charity were to "an identified or ascertainable object," which could be judicially determined, and thereby effectuate the declared intention of the donor. Is there such an object in this case? Can the court, unable to bring the Society of Jesus before it, appoint a trustee, and select for his execution a religious or educational object, which will effectuate the intention of the donor, "and not arbitrarily and in the dark, presuming on his motives or wishes, declare an object for him?" We do not think so. Whatever educational or religious purpose the chancellor, or his trustee, or this court, might select, would be open to the objection that it was not the declared intention of the testator, and that it was possibly an object of which he would not have approved. To effectuate a charitable use in this State, it is necessary that the courts should be able to control the trustee, and, if necessary, upon the application of the decedent's heirs at law, revise his action.

Should we attempt to do so in this case, we should not be acting judicially. As said by Judge Robertson in Moore's Heirs v. Moore's Devisees, 4 Dana, 366, 29 Am. Dec., 417, the court "does not act judicially when it applies his bounty to a specific object of charity, selected by itself, merely because he had dedicated it to charity generally, or to a specified purpose which can not be effectuated; for the court can not know or decide that he would have been willing that it should be applied to the object to which the judge, in the plenitude of his unregulated discretion and peculiar benevolence, has seen fit to decree its appropriation, whereby he, and not the donor, in effect and at last, creates the charity." We are of opinion that the bequest in the clause under consideration is clearly within the rule laid down in the Spalding case, and is invalid.

We come now to the consideration of the residuary clause, being clause 20: "All the remainder of my estate, after the payment of the specified legacies and bequests, I wish to be invested and placed in trust with the Rt. Rev. Bishop of the Catholic Diocese of Louisville, and three others, to be chosen by him, for the establishment of a home for poor Catholic men, as soon as the proceeds of my estate may justify it." This clause also is attacked upon the ground that it is too indefinite to be executed, and counsel upon both sides have argued it with great zeal and learning, and not altogether without temper. There is no objection to the trustee selected, and we see no valid objection to the power granted him to select his colleagues. The sole question is whether the object for which this bequest is made is sufficiently definite to be enforced. Upon this question the argument has taken such a range as to render necessary a consideration of the history of the statute in force at the date of the testator's death. The stat-

ute of 43 Elizabeth (chapter 4) came to us by virtue of the ordinance of Virginia of 1776 (9 Hen. St. at Large, p. 127, which is printed in 1 Morehead & B., p. 612), providing: "That the common law of England, all statutes or acts of parliament made in aid of the common-law prior to the fourth year of the reign of King James the First, and which are of a general nature, not local to that kingdom, . . . shall be the rule of decision, and shall be considered as in full force, until the same shall be altered by the legislative power of this colony." That ordinance was, by the Constitution of 1792, as re-enacted in the Constitution of 1799 (article 6, section 8), adopted as the law of Kentucky by a provision that:" All laws which on the first day of June one thousand seven hundred and ninety-two were in force in the State of Virginia, and which are of a general nature, and not local to that State, and repugnant to this Constitution, nor to the laws which have been enacted by the Legislature of this Commonwealth, shall be in force within this State, until they shall be altered or repealed by the General Assembly,"—citing Hunt v. Warnicke's Heirs, Hardin, 62. It is an interesting fact that in November, 1792, a few months after the adoption by Kentucky of this ordinance, it was repealed by Virginia, which accounts in some measure for the difference between the rulings upon charities in Virginia from those which prevail in Kentucky. The question has been elaborately argued how far the statute of Elizabeth (to be found in 1 Morehead & B. p. 308) was adopted as the law of this State, appellees contending that only the preamble was thereby adopted, because the 10 enacting clauses of the act are necessarily local to England, and were, therefore, never adopted by either Virginia or Kentucky. On behalf of appellants it is contended that, while the mode of procedure

prescribed by the statute by the appointment of commissioners under the great seal of England, or the seal of the county Palatine of Lancaster, as the case might require, was local to England, and not adopted by either Virginia or Kentucky, yet a corrective process by the court of chancery itself, without the intervention of commissioners, was obtained in virtue of the statute, and as an outgrowth of it, by the English chancellor, and, to the extent it was judicial, was adopted by the constitutional adoption of the Virginia ordinance, and asserted and exercised by the Kentucky courts. An examination of the authorities convinces us of the correctness of appellant's contention. It is undoubtedly true that after the adoption of the statute in England the courts asserted and exercised wider powers in the correction of abuses of charitable trusts, and did so directly, and not through the intervention of the commissioners provided by the statute. And so it was natural that when the Kentucky courts came to consider the application of the statute thus adopted to Kentucky charities, they should adopt with it the outgrowth of power derived from the chancellor's personal exercise of the royal prerogative to the extent that it had been exercised in England, because it had come to be there exercised, in form at least, judicially. And it was natural that the Kentucky courts should at first have regarded all the powers which had grown out of the concurrent exercise and subsequent confusion of the judicial and prerogative power as not local to England, and should have sought to localize them in this State. And so we find Judge Nicholas, in Gass v. Wilhite, 2 Dana, 177, 26 Am. Dec., 446, asserting in the broadest terms, not only that the statute was in force in Kentucky, but the existence of the English cy pres doctrine to its fullest extent. Said Judge Nicholas: "Notwithstanding

the attention of counsel had been invited to the question whether the statute 43d of Elizabeth, of charitable uses, was in force here, it was not contended on the argument that it was not. Our own reflections have not led to any plausible suggestion why it should not be considered as in force. It has never been repealed, nor is there anything in it of so peculiar and local a character as to exclude it from adoption, under the rule embracing all English statutes of a general character prior to 4 James I. It is treated as in force, and has been acted on, in several of the other States. The establishing of the fact that it is still in force relieves us from the necessity of investigating the very vexed question as to the true extent of chancery power and jurisdiction over charitable uses, independent of that statute. It also relieves us from an investigation of the question whether, according to the principles of the common law, there is here a defect or want of *cestuis que trustent*, to take the use according to the apparent intent of the covenant of association; or whether the uses themselves are of too indefinite and uncertain a character to be enforced, independent of that statute; for, according to a construction of 200 years, and which has been acted on in numberless cases under that statute, neither of those circumstances will invalidate the trust, provided it be a charitable use. Where the objects of the charity and the mode of its application are pointed out, but not with sufficient distinctness or certainty to be specifically and accurately enforced, the court will, under its cy pres doctrine, give it effect, as near the general intent as may be; and even where there is no specific mode or object pointed out, and in some cases where the object fails or ceases to exist, the court will, in respect of the general charitable purpose, devise a mode itself for giving it effect and employing the chari-

table funds, supply an original want of trustees, or, if necessary, displace old and create new ones." Almost immediately thereafter, in Moore's Heirs v. Moore's Devisees, 4 Dana, 366, 29 Am. Dec., 417, Chief Justice Robertson greatly limited the doctrine laid down in the Gass and Wilhite case, still asserting, however, the cy pres doctrine as a judicial doctrine to a limited extent. In the Curling case, 8 Dana, 38, 33 Am. Dec., 475, it was held that a devise for the "benefit of a public seminary" was "not, as at common law, void. The statute makes is valid according to the British doctrine. And, if it can be judicially executed, it is good according to the Kentucky doctrine also." And so Judge Robertson held that the testator intended his bounty for the seminary of his county, and that, "even if the Trigg Seminary could not claim the bounty as a matter of clear and exclusive right, nevertheless we are of the opinion that the application of the fund to that seminary would effectuate the declared purpose of the testator more certainly and appropriately than any application that could be made of it to any other seminary of learning." The statute is clearly here recognized not as merely giving a definition of charities or a list by which gifts supposed to be charitable might be tested, but as giving to the courts and judiciary of Kentucky certain remedial and corrective powers which would not be possessed by them in the absence of the statute. So, in the much-criticised opinion of Judge Breck, in Attorney General v. Wallace's Devisees, 7 B. Mon., 612, an exceedingly loose devise was held to give the testator's "trusty friends," his trustees, power, under the statute of Elizabeth, to select as beneficiaries of the will certain established benevolent and charitable institutions then in existence. The validity of the clause and the propriety of the proceeding by the attorney general as well are sustained

expressly under the statute of Elizabeth, and the power of
the court to enforce the trust by a scheme is asserted.    In
1852, the statute now under consideration was adopted.
It took the preamble of the former statute, with some de-
scribed changes, added to the list a few charitable objects
—notably churches, which, as Mr. Perry says, had been,
"by analogy, deemed within its spirit or intendment"—and
added also the words, "or for any other charitable or hu-
mane purpose," which can hardly be construed to do more
than include the charitable purposes which had already been
deemed within the spirit and intendment of the old act, and
provided that all grants, etc., for such purposes should
be valid, except as thereinafter restricted.    It provided,
also:   "No charity shall be defeated for the want of a
trustee or other person in whom the title may vest; but
courts of equity may uphold the same by appointing trus-
tees, if there be none, or by taking control of the fund or
property and directing its management and settling who is
the beneficiary thereof."    Now, if there is a difference be-
tween this statute and the former one, which was held by
the Kentucky decisions to be in force here, what effect did
it have, and what was its purpose?    Was it intended to,
or did it, broaden the scope of the old statute, as is con-
tended by counsel for the Society of Jesus and the Bishop
of Cork?    We can not think so.    That statute, even in
Kentucky, and even after the great opinion of Judge Rob-
ertson in the Moore case, which undertook to confine the
English cy pres doctrine within the limits of strictly judi-
cial powers, had received construction which could not have
suggested to the legislative mind any necessity for broad
ening the scope of the act.    If there was need of legislation,
it was in the other direction.    Such trusts shall be valid,
says the statute.    How valid?    Then the statute proceeds

to point out the modes in which they may be validated:
First, a trustee may be supplied, if necessary, in whom
the title may vest; or the court may take control of the
fund or property. The court may direct the management
of the property, and may settle who is the beneficiary. Is
there anything in this, fairly construed, that indicates an
intent to empower the courts to give definition to trusts
which the grantors failed to define, to furnish an intent
when none is expressed, to direct the management of a
fund devoted to an unascertainable object, or to settle
who is the beneficiary when the testator left no clew? That
statute was intended, not to enlarge, but to define, the
powers of the court. As illustrative of this intent, we
find incorporated in the third section the mortmain stat-
ute of 1815, limiting the amount of landed estate which
may be held by any church or society of Christians.

We do not for a moment suppose this enactment was
intended as a hostile attack upon charitable uses, or as
looking toward such a crusade against them as took place
in the time of Henry VIII; but that it was intended to
limit, to define, and to set boundaries to the powers of
the courts we have no manner of doubt, from an exam-
ination of the statute itself; and this construction was
given to it by perhaps the greatest of our judges, in the
only opinion of this court in which the effect and object
of the Kentucky statute appear to have been considered
and adjudged. The same great judge had, in the Moore
case, undertaken to limit the application of the cy pres doc-
trine by the chancellor. The doctrine then announced had
not been rigidly adhered to. In Attorney General v. Wal-
lace's Devisees, 7 B. Mon., 612, and in the Curling case, 8
Dana, 38, 33 Am. Dec., 475, the results of the opinions by
Judge Breck and by Judge Robertson himself are not sup-

ported by the doctrine announced in the Moore case, though the intent of the testators was declared to exist in such form as to make that doctrine applicable. But in Cromie's Heirs v. Louisville Orphans' Home, 3 Bush, 373, the effect of the Kentucky statute was considered. Said the court, through Judge Robertson: "While the statute of Elizabeth concerning charities was constructively abolished in Kentucky (1 Rev. St. p. 177), it was, in American phase, substantially re-enacted. Id., p. 235. And thus, though the ultrajudicial cy pres doctrines which royal prerogative attached as excrescences to the statute of Elizabeth had, by its repeal, been cut off as tumors, the aim of our own statute for upholding charities is to make such as it enumerates available whenever so defined as to be judicially identified and applied." The English statute was re-enacted, but "in American phase." Charities could still be created according to American doctrine. The outgrowth of the English statute was not to exist here, and the aim of our own statute was compactly and definitely expressed. It was a conservative enactment. It did not put charitable uses upon the same plane as private trusts. They were not void as against the statutes as to perpetuities. They were not to be defeated for want of a trustee. They were not required to be so definite as to be valid as private trusts. But the "American phase" of the statute of charitable uses did require a reasonable certainty, for it required the charitable objects to be so defined as to be judicially identified. The courts were no longer to exercise the prerogative of changing or making wills; and the judge refers approvingly to the repudiation of the cy pres doctrine in New York, and to the strictly judicial application of charities in that State. He believed, and said so in the opinion, that the object of the repeal of the British statute

"was to substitute a system more congenial with our in-
stitutions, and, by a legislative indorsement of the doc-
trine suggested in Moore's Heirs v. Moore's Devisees, supra,
to eliminate the cy pres doctrine of England." We find
nothing in the statute to indicate that it was intended
as an enabling act, as the statute of Elizabeth was. It does
not undertake to enlarge the power of the chancellor in
any way. It gives no power to enforce an indefinite gift.
It provides that a trust shall not fail for want of a trus-
tee, but it does not empower the courts to create a *cestui
que trust*. The court will, under the statute, settle who
are the beneficiaries of a trust, if one is created, but it must
settle them from the words of the gift; they must be judi-
cially ascertained. It is not doubted that the individual
beneficiaries of the bounty need not be named. That would
render the gift a mere private use, and subject to the rule
against perpetuities. And while the donee of a power
may create or cause to spring a private use, limited in dur-
ation by the law against perpetuities, such is not the law
as to charitable uses, which are perpetuities. The donor
must select his charity. He may delegate power to select
the individual recipients of his bounty, but a gift to char-
ity in general is too vague to be enforced. Spalding v. In-
dustrial School (107 Ky., 382) (21 R., 1107) 54 S. W., 200. A
charitable use which is relieved from the operation of that
rule must be so definitely expressed that the courts can
judicially, and with reasonable certainty, apply the gift
to that object.

We may notice here the very interesting argument of ap-
pellants' counsel as to the difference between the statute
of Elizabeth and the Kentucky statute. In the older stat-
ute, these words are used, "for relief of aged, impotent
and poor people," while our statute reads, "for the relief

or benefit of aged, or impotent and poor people;" from which it is argued that, while the older statute might have permitted a charity for the poor, though not helpless, or for the aged, though not poor, our statute does not permit a charitable use for the benefit of the rich, though old or impotent, or for the poor, unless they were old or impotent. But we think the distinction sought to be made lies only in the language used, and does not exist in the meaning of the two statutes. In the old statute, as in the new, the poor and the aged for whose relief charitable uses were permitted were the poor and the aged who needed charity, and under neither statute would a charity for sturdy beggars or elderly millionaires be properly sustained. And so we think it is with such language when used in a gift to be applied under either statute. The "poor" will be construed to mean, not the poor who are abundantly able to provide for themselves, but the poor who need assistance; and "aged" to mean such aged people as are properly objects of charity.

Nor do we think that the devise in question is objectionable as a sectarian charity, or as a devise to provide for hospitality rather than charity. This court has never recognized it as an objection to a charitable use that its bounty was confined to members of one race of one religion. Nor, on the other hand, do we think that the word "poor," as used in this devise, can be properly construed as indicating a merely hospitable purpose. The purpose of this devise was, in our judgment, charitable. The sole question is whether it was definite enough to be enforced.

Tested by this statute, is the bequest too vague and indefinite to be sustained? It is suggested for appellee that, in order that the court may be able to exercise the powers given by section 2 of the act (1 Revised Statutes, p. 236),

directing the management of the trust and settling who shall be the beneficiaries thereof, the will must be construed as requiring the establishment of the home in Louisville, because the trustee is the Bishop of the Diocese of Louisville, the trust is reposed in him in his official capacity, and he has no power beyond his diocese. On the same principle it would seem to follow that the beneficiaries must be selected from that diocese, which, as we understand, includes the State of Kentucky. If the devise can be sustained, it must be upon such a construction, and that is the interpretation we must give it in order to make it sustainable.

On the other hand, these objections are urged to the validity of the devise: First, that it does not name a charitable object under our statute, which requires that the poor who may be beneficiaries of a charitable use must also be aged or impotent—an objection already considered; second, because no power is given to any one to select the object of the charity; third, because no place or district or country is named in which the home is to be established, and no place or district or class is reasonably defined from which the beneficiaries are to be selected; and, fourth, because no one is given power to make such selections. Assuming the object of the devise to be sufficiently definite, we have little difficuly with the second objection. A trustee is named, the appointment of three associates is provided for, and the fund is devoted "for the establishment of a home for poor Catholic men as soon as the proceeds of my estate may justify it." And, if the will furnishes a guide to the purpose of the testator, the trustee and his associates have authority to act in the selection of a site for the home, and in its establishment and management under the control and direction of the chancellor. But it is objected that

there is nothing in the will which places any limitation of time or place or circumstances upon the establishment of the home, or any limitation of district or boundary or class which will enable as to judicially ascertain or identify the objects of the testator's bounty.  With considerable hesitation, and after much consideration, the court has reached the conclusion that a construction can fairly be given to this clause of the will sufficiently definite to enable the trustee to carry out, and the court to control and enforce, the testator's charitable purpose.  The trustee selected to receive the trust fund is not selected as a person, but as an official of the church.  He is the Right Reverend Bishop of the Catholic Diocese of Louisville. As such he has under his immediate dominion not only such matters as are strictly ecclesiastic, but to a great extent the charities of the church.  Whether he still exercises the powers of a corporation sole this record does not disclose, but he undoubtedly exercises supervision over the recognized charities of the Roman Catholic Church in his diocese.  And while there is a recognized distinction between a gift to create a charitable institution, without naming its scope or location or designating, territorially or otherwise, the class from which the beneficiaries are to be selected, such as appellants claim the gift in question is, and a gift for the purpose recognized as charitable under the statute to an established and organized institution having defined and stated aims and purposes, which by virtue of the selection of that institution can be written in the terms of the gift, it may be that there is a just analogy between gifts of the latter class and a gift for a recognized charitable purpose to a church official in his official capacity, having jurisdiction as such over the charitable institutions of like char-

acter within a defined territory, and managed under reg-
ulations and upon conditions which may be considered as
adopted by the donor by the selection of such official, and
thereby written into the terms of his gift. It may not be
too great a stretch of the court's powers of interpretation
to presume that the donor made the gift upon terms in
harmony with the purposes of kindred organizations in that
ecclesiastical jurisdiction, and for the benefit of such sim-
ilar objects of charity as are provided for in that district.
Giving this construction to the clause in question,—that
the home was intended to be established in Louisville, and
that the beneficiaries were to be selected from Catholic
poor men in that diocese—it follows that the trust is
such as the chancellor can control and enforce, and, if nec-
essary, settle who are the beneficiaries thereof. It fol-
lows, therefore, that the judgment of the chancellor as to
this clause was not erroneous.

The paragraphs of the answer which plead knowledge on
the part of the appellants of the administration under the
will are good to the extent that, in so far as the appellants
have knowingly permitted the executors and trustees un-
der the void clauses to proceed with the execution of the
will as if valid, and to expend the fund for the benefit of
the supposed objects of charity, no recovery can be had,
nor, if investments have been made in execution of the sup-
posed purposes of the void clauses, can recovery be had for
the loss, if any, occasioned by such reinvestment.

In the particulars indicated in the opinion, the action of
the chancellor in carrying back and sustaining the demur-
rer to the petition was erroneous. The demurrer should
have been sustained in part, as indicated herein.

If appellants can show a refusal to recognize their visi-
torial right, or if any abuse of the trust or misapplication

of the fund can be shown, the court can enforce such right. In this respect the petition seems to be defective, and on the return of the cases leave may be given to amend.

For the reasons, given and to the extent indicated, the judgment is reversed, and cause remanded with directions to set aside the judgment dismissing the petition, and for further proceedings consistent herewith.

Whole court sitting.

Judge Paynter dissents from so much of the opinion as holds the bequest to the Jesuit order void.

**Petition for rehearing by appellee overruled.**